178 P.3d 485

PUEBLO SANTA FE TOWNHOMES OWNERS' ASSOCIATION, Inc., an Arizona non-profit corporation, Plaintiff/Appellee,

v.

TRANSCONTINENTAL INSURANCE COMPANY and Transportation Insurance Company, Defendants/Appellants.

No. 1 CA–CV 07–0215.

Court of Appeals of Arizona, Division 1, Department B.

March 13, 2008.

Review Denied Sept. 23, 2008.

Meagher & Geer, P.L.L.P. By Thomas H. Crouch, Scottsdale, and Nixon, Peabody, LLP By Walter T. Johnson, San Francisco, Attorneys for Defendants/Appellants.

Mann, Berens & Wisner, LLP By Jay M. Mann, Scott F. Frerichs, Phoenix, Attorneys for Plaintiff/Appellee.

## OPINION

JOHNSEN, Judge.

¶ 1 This is an appeal of a judgment entered after a subcontractor and a homeowners association entered into a *Morris* agreement[1] assigning the subcontractor's rights under an insurance policy issued by Transcontinental Insurance Company ("CNA"). The superior court found that because CNA delayed for 18 months before informing the subcontractor that it reserved its right to deny indemnity coverage, thereby prejudicing the subcontractor, CNA was estopped from asserting coverage defenses against the homeowners association. The court also approved a stipulated judgment of $1.1 million plus attorney's fees as reasonable and ordered CNA to pay prejudgment interest from the date of the agreement.

¶ 2 We conclude the superior court correctly held CNA estopped from denying coverage but that the court erred in granting prejudgment interest from the date of the *Morris* agreement because the stipulated amount was not liquidated until the court

1. A *Morris* agreement permits an insured defended by an insurer under a reservation of rights to agree on a judgment amount with the claimant and assign the claimant its rights under the insurance policy in exchange for the claimant's covenant not to execute the judgment against the insured. *See United Servs. Auto. Ass'n v. Morris*, 154 Ariz. 113, 119, 741 P.2d 246, 252 (1987); *see also Waddell v. Titan Ins. Co., Inc.*, 207 Ariz. 529, 531 n. 1, ¶ 4, 88 P.3d 1141, 1143 n. 1 (App.2004).

approved the settlement. Accordingly, we affirm the judgment as modified.

## FACTUAL AND PROCEDURAL HISTORY

¶ 3 This appeal arises out of construction defect claims by Pueblo Santa Fe Townhomes Owners' Association, Inc. ("Pueblo") against a general contractor and two construction managers. The alleged defects included numerous large cracks in the homes' exterior stucco that allegedly created avenues for water to enter the interior. Subcontractor Palo Verde Plastering ("PVP") performed the stucco work on 34 of the buildings.

¶ 4 Pueblo filed its complaint on June 17, 1998. After Pueblo served a "Doe Amendment to Complaint" that identified PVP and other subcontractors as defendants, PVP submitted a notice of claim to CNA on August 5, 1999.[2] Shortly thereafter, CNA retained a Phoenix law firm to represent PVP.

¶ 5 CNA insured PVP under a commercial general liability policy that contained a "your work" exclusion that disclaimed coverage for damage to "[w]ork or operations performed by you or on your behalf . . . and [m]aterials, parts or equipment furnished in connection with such work or operation." According to CNA, the effect of this exclusion was that the policy would cover "resulting damages" for which PVP might be held liable—meaning, for example, water damage to the interior of the homes caused by cracks in the stucco PVP had applied—but would not cover the cost to repair or replace the stucco itself. The "your work" exclusion was significant in this case because from early on, Pueblo had identified stucco repair/replacement as a major component of its alleged damages. According to a report prepared for Pueblo in October 1999, for example, cracks would re-

quire stucco repair or replacement at a cost of some $2.3 million.

¶ 6 Evidence at trial showed that whenever a subcontractor insured by CNA submitted a notice of claim in a construction-defects case, CNA's practice was to issue an immediate reservation of rights letter to the insured. For a reason that was never explained, however, CNA failed to do so in this case. It was not until February 2001, 18 months after PVP submitted its claim, that the CNA claims handler noticed the file contained no reservation of rights letter. She issued the letter on February 19; due to a mix-up with PVP's address, however, the letter was not received until March 1, 2001.

¶ 7 In the meantime, by agreement of the parties, the superior court had set a deadline in October 2000 for the completion of any destructive testing to be performed on the homes within the Pueblo development. The court also ordered that any expert who failed to appear at the scheduled testing would not be permitted to conduct any additional testing outside of the established schedule.

¶ 8 Destructive testing often is performed in construction-defect cases to determine the extent of damage and evidence of the existence or cause(s) of particular defects. Where stucco cracks are abundant, for example, parties may hire consultants to cut through the stucco and the wall beneath to determine whether water has permeated the interior of the building through the cracks. Destructive testing also may disclose the cause of the defects—where stucco has cracked, for example, destructive testing may reveal foundation movement or unstable framing or other structural problems that may have caused the cracks.

¶ 9 The lawyers that CNA retained to represent PVP did not inform PVP of the court-ordered deadline for destructive testing, and no one participated in or attended the testing on PVP's behalf.[3] Several other parties, law-

---

**2.** In April 2000, Pueblo filed a first amended complaint that alleged claims against PVP and other subcontractors. Several months later, the original defendants filed a cross-claim against numerous subcontractors, including PVP.

**3.** As explained below, ¶ 37, the lawyer CNA retained to represent PVP testified that his practice when representing subcontractors in defect cases

is not to conduct destructive testing. According to his testimony at trial, however, neither he nor the associate working on the case seemed to understand that the testing actually took place during the court-ordered period. In a letter to an expert witness, the associate wrote, "I am informed that destructive testing occurred prior to this law firm's becoming involved in the case."

yers and expert witnesses attended the testing. Based on the test results, Pueblo disclosed an expert witness report that faulted the chemical content of the stucco PVP used on the townhomes. That report became the basis of Pueblo's claim against PVP based on the stucco cracks.

¶ 10 Before PVP received CNA's letter reserving the right to deny coverage for the costs of repair or replacement of the stucco, Gloria and Frank Morgan, who own PVP, had not been actively monitoring the litigation. Within a couple of weeks after receiving the letter, they began searching for additional legal assistance. PVP eventually retained separate counsel to monitor the lawsuit, although the original counsel hired by CNA remained PVP's counsel of record.

¶ 11 It was not until May 31, 2001, seven months after the destructive-testing deadline, that the law firm that CNA had retained for PVP hired an expert witness for PVP. The expert, Michael Keith, met on June 15, 2001, with the Morgans and the associate from the retained law firm. Gloria Morgan testified that she was "chomping at the bit" when she heard an expert had been hired because she was eager to meet with somebody to discuss their defense. There is no indication in the record that PVP was aware at the time that the deadline for conducting destructive testing of the townhomes had already expired. Gloria Morgan testified that she did not learn until nearly a year later that additional destructive testing would not be allowed.

¶ 12 As 2001 drew to a close, it was becoming more and more clear that a judgment against PVP might be very significant. In late November, Pueblo served a revised "Cost to Repair Estimate" that stated that the direct cost to repair the stucco was just under $1.5 million and the total cost when combined with a pro-rata share of the overhead and related expenses was greater than $2.1 million. An internal consultant reported to CNA that although the portion of possible damages against PVP that CNA believed to be covered under its insurance policy likely would be no more than $20,000, PVP faced uninsured exposure of between $600,000 and $800,000 to repair the stucco and up to $1.5 million to replace it. Gloria Morgan testified that the partner of the law firm CNA retained to represent PVP contacted her and her husband in late December 2001 to "urgently" invite them to a meeting at which the company's potential exposure was discussed. They left the December 26 meeting feeling "pretty shaken" because of the lawyer's questions about whether their personal assets were protected from exposure to liability.

¶ 13 In April 2002, PVP assigned one of its employees, Rick Skeens, to study the facts relating to Pueblo's claims. Skeens, who had a college background in chemistry, was critical of the calculations and logic underlying Pueblo's report criticizing the chemical content of the stucco. He worked with Keith and with a structural engineering expert witness that CNA had retained to develop PVP's defense. Meanwhile, however, other defendants in the case were negotiating settlements with Pueblo that preserved their indemnity claims against PVP. The original defendants reached a settlement with Pueblo during mediation in March 2002, and as part of that settlement assigned to Pueblo their indemnity claims against PVP.

¶ 14 In April 2002, CNA filed a declaratory relief action against PVP and Pueblo, seeking a judgment declaring that it had no duty to indemnify PVP for damages other than those that "resulted" from PVP's work. PVP later filed a counterclaim alleging bad faith liability and seeking indemnity under the policy.

¶ 15 PVP and Pueblo participated in a mediation in June 2002, but the mediation was not successful. It was apparent from that session that PVP would be, in Gloria Morgan's words, "the last man standing" among the defendants. According to a report retained counsel prepared for CNA as an October 2002 trial date approached, "[i]t is unlikely that [PVP] will not ultimately have to pay something." Although PVP's counsel's "best estimate" was that PVP would be found liable for between $50,000 and $100,000 in damages, Pueblo was seeking more than $2 million against PVP and another subcontractor responsible for the stucco work. Just prior to trial, PVP finally entered into a *Morris* agreement with Pueblo in which PVP stipulated to a $1,100,000 judgment. PVP

assigned Pueblo all of its claims against CNA, but reserved its right to sue for bad-faith damages along with attorney's fees and costs associated with that claim.[4]

¶ 16 Following the *Morris* agreement, the superior court consolidated the CNA/PVP declaratory judgment action with the action brought by Pueblo against CNA pursuant to the settlement. The issue in the six-day coverage trial to the court was whether CNA would be estopped from denying coverage based on its delay in reserving its rights to contest coverage. The court made detailed findings in which it concluded that CNA's 18–month delay in reserving its rights prejudiced PVP because PVP did not have the opportunity to have its own expert participate in the destructive testing that took place without its knowledge in October 2000, at a time when PVP was unaware that CNA disputed coverage of damage to the stucco that PVP had installed on the Pueblo townhomes.

¶ 17 Citing *United Services Automobile Ass'n v. Morris*, 154 Ariz. 113, 741 P.2d 246 (1987), the court noted that an insurer that believes it has a valid coverage exclusion and wishes to defend a suit under a reservation of rights will be estopped from litigating coverage if it does not "properly and timely communicate" its reservation of rights. The court observed that a conflict of interest between CNA and PVP arose out of the insurer's decision to reserve its rights to disclaim coverage for the cost of repair or replacement of the stucco, which dwarfed other damages that CNA acknowledged fell within the scope of the policy. The court concluded:

> Once CNA knew that a potential policy defense existed, a conflict of interest arose between it and [PVP]. CNA controlled the defense of the claim against [PVP] for approximately 18 months while knowing of this conflict and without informing PVP. During that 18 month span, CNA retained the exclusive right to control the litigation defense, including all discovery, investiga-

tion, and strategy as well as the exclusive right to settle the claim against [PVP]. . . . PVP did not have the opportunity to determine how to defend itself independent of the insurer since it did not know of the reservation of rights decision by its carrier. For example, it could have conducted a vigorous cross claim action against the [framing subcontractor] who its experts felt [was] at fault for the stucco damages. . . . This injury to Pueblo caused by the Framers could have been covered under [another] portion of PVP's policy with CNA. This would have afforded a defense both to [Pueblo's] claims as well as the claim by CNA that the policy did not provide coverage to PVP. The insured could have followed through with this defense by participating in destructive testing suggested by its experts according to the schedule established by the Court had it known of the [reservation of rights] letter. This lack of opportunity is sufficient prejudice to [PVP] to prohibit [CNA] from denying coverage because of its failure to timely advise [PVP] of the reservation of rights.

¶ 18 CNA appeals the court's findings and conclusions.[5] We have jurisdiction pursuant to Arizona Revised Statutes ("A.R.S.") section 12–2101(B) (2003).

## DISCUSSION

### A. Standard of Review.

¶ 19 In an appeal from a judgment entered after a trial to the court, "[w]e view the facts in the light most favorable to sustaining the trial court's judgment," *Cimarron Foothills Cmty. Ass'n v. Kippen*, 206 Ariz. 455, 457, ¶ 2, 79 P.3d 1214, 1216 (App.2003) (quoting *Sw. Soil Remediation, Inc. v. City of Tucson*, 201 Ariz. 438, 440, ¶ 2, 36 P.3d 1208, 1210 (App.2001)), and will "defer to the trial court's factual findings as long as the record supports them," *In re the Gen. Adjudication of All Rights to Use Water in the Gila River Sys. & Source*, 198 Ariz. 330, 337,

---

4. PVP later settled its bad-faith claim against CNA for $20,000. It also settled, for an undisclosed amount, a legal negligence claim against the law firm that CNA retained.

5. In a subsequent proceeding, the superior court found the amount of the stipulated judgment reasonable. CNA does not appeal that decision.

¶ 15, 9 P.3d 1069, 1076 (2000). However, we review *de novo* pure questions of law and mixed questions of law and fact. *See Robson Ranch Mountains, L.L.C. v. Pinal County,* 203 Ariz. 120, 125, ¶ 13, 51 P.3d 342, 347 (App.2002).

## B. Estoppel.

¶ 20 CNA first argues that while under some circumstances an insured may be permitted to invoke equitable estoppel against an insurer, the doctrine has no place when the insured's rights have been protected by a *Morris* agreement and the party seeking coverage is not the insured but a non-party to the insuring agreement. Alternatively, CNA argues that even if Pueblo properly was permitted to invoke estoppel, Pueblo did not establish that CNA's delay prejudiced PVP.

### 1. General principles.

¶ 21 Our analysis begins with the rule that an insurer typically owes a duty to indemnify the insured against liabilities covered by the policy and a duty to defend the insured against any claim "potentially covered by the policy." *Morris,* 154 Ariz. at 117, 741 P.2d at 250. By virtue of its duty to defend, an insurer gains "the advantage of exclusive control" over the litigation. *Id.*

¶ 22 When an insurer reserves its rights to contest indemnification liability, however, a conflict of interest is created between the insurer and the insured. As in this case, for example, when a claimant seeks damages the insurer may contend are not covered under the policy, the interests of insured and insurer diverge. An insured that is notified of its insurer's reservation of rights is on notice of the conflict of interest and is free, upon proper notice to the insurer, to act to protect its rights in the litigation with the claimant. In *Morris,* the Arizona Supreme Court held that under these circumstances an insured may protect itself from "the sharp thrust of personal liability" by assigning to the claimant the insured's coverage rights under the policy. *Id.* at 118, 119, 741 P.2d at 251, 252 (internal quotation and citation omitted). By such an agreement, the insured escapes or reduces liability for damages, and the claimant steps into the shoes of the insured to litigate the insurer's policy defenses.

¶ 23 If the insurer continues to exercise exclusive control of the defense without informing its insured that it is reserving rights to contest coverage, however, the insured has no reason to act to protect its rights because it is unaware that a conflict of interest exists between itself and the insurer. For this reason, as this court explained in *Equity General Insurance Co. v. C & A Realty Co.,* 148 Ariz. 515, 715 P.2d 768 (App. 1985), an insurer may be estopped from asserting coverage defenses if it assumes an insured's defense without reserving its rights:

> It is the reliance of the insured upon the insurer's handling of the defense and the subsequent prejudice which gives rise to an estoppel in the first instance against the insurer from raising policy defenses.

*Id.* at 518, 715 P.2d at 771 (internal citations omitted). As the court observed in Morris, "[a]n insurer with a coverage defense must defend its insured under a properly communicated reservation of rights or it will lose its right to later litigate coverage." 154 Ariz. at 116, 741 P.2d at 249. *See Hagen v. U.S. Fid. & Guar. Ins. Co.,* 138 Ariz. 521, 525, 675 P.2d 1340, 1344 (App.1983) (insurer must notify insured "promptly" and "without delay") (internal quotation and citation omitted), *approved by* 138 Ariz. 491, 675 P.2d 1310 (1984); *see also Ogden v. U.S. Fid. & Guar. Co.,* 188 Ariz. 132, 136, 933 P.2d 1200, 1204 (App.1996) ("An insurer with a potential coverage defense loses its right to later litigate coverage if it defends its insured without a properly communicated reservation of rights.").

### 2. Estoppel may be invoked by a claimant-assignee pursuant to a *Morris* agreement.

¶ 24 CNA argues that a third-party claimant should not be permitted to argue estoppel in a case such as this. It contends that the insured is fully protected when it has received a covenant not to execute from the claimant pursuant to a *Morris* agreement. CNA contends there is no reason in such a situation to permit the third-party claimant

two opportunities to win coverage—first, by arguing the insurer should be estopped from denying coverage and, if that fails, by arguing the insurer's policy defenses are invalid.

¶ 25 In the settlement agreement, PVP expressly granted to Pueblo:

> all ... rights, title, and interest in any and all other claims, actions, causes of action, suits, debts, liens, obligations, covenants, contracts, agreements, promises ... of any nature or kind whatsoever, ... against CNA regarding (1) the actions, omissions, and conduct of CNA in connection with [PVP] and in connection with or arising out of the [Pueblo litigation]; or (2) any and all coverages under any contract, POLICY, or the like issued by CNA for claims asserted against [PVP] in the [Pueblo litigation].... With the exception of [PVP's claim for bad faith], this assignment of claims ... includes any claims or legal theories which could be asserted by [PVP] against CNA ...
>
> * * *
>
> (6) based on the idea that CNA is guilty of a breach or anticipatory breach of its contractual obligations; and
>
> (7) *based on the idea that CNA is subject to any kind of estoppel or waiver as to its Reservation of Rights, refusal to defend or otherwise.*

(Emphasis added.)

■ ¶ 26 The language recited makes clear the parties contracted for the assignment not only of any coverage claims PVP might have against CNA, but also for the assignment of whatever right PVP may have had to assert that CNA was estopped to deny coverage. Under the normal rule, Pueblo, as the assignee of those rights, would be entitled to assert them. "When an insured assigns his right to sue his insurer under a liability policy, the assignee takes ... those rights that the [insured] had." *Republic Ins. Co. v. Feidler,* 178 Ariz. 528, 534, 875 P.2d 187, 193 (App.1993); *see also Manterola v. Farmers Ins. Exch.,* 200 Ariz. 572, 578, ¶ 16, 30 P.3d 639, 645 (App.2001) (rights a claim-

ant/assignee acquires through a *Morris* agreement are no different than the insured/assignor's rights prior to the agreement). Furthermore, the "assignee steps into the shoes of [the] assignor." *K.B. v. State Farm Fire & Cas. Co.,* 189 Ariz. 263, 267, 941 P.2d 1288, 1292 (App.1997) (insurer may assert estoppel against an insured's assignee under a *Morris* agreement). The assignment does not "alter the defenses or equities" of the assignee. *Stephens v. Textron, Inc.,* 127 Ariz. 227, 230, 619 P.2d 736, 739 (1980).[6]

■ ¶ 27 CNA cites no legal authority, and we have found none, for the proposition that as a matter of law, an assignee that has contracted pursuant to a *Morris* agreement to receive an insured's right to assert estoppel may not exercise that right. Although CNA contends an insured that enters into a *Morris* agreement does not require the protection of estoppel, it fails to acknowledge that the prejudice the insured incurred because of the insurer's failure to timely reserve its rights may have driven the insured to seek the *Morris* agreement protection in the first place.

¶ 28 CNA argues the court's decision adopting estoppel conferred an unfair windfall on Pueblo. The equities do not favor the insurer in a situation such as this, however. If Pueblo were barred from asserting whatever estoppel rights PVP acquired by virtue of CNA's delay, CNA would be able to avoid the consequences of its conduct simply because its insured chose to protect itself from the risk of the litigation—risk that may have been enhanced by CNA's delay in reserving its rights—by entering a *Morris* agreement. We decline to adopt a rule that would enable an insurer to avoid responsibility in that manner for failing to promptly notify its insured of its reservation of rights to deny coverage. Moreover, the prospect of the penalty of estoppel presumably motivates insurers to comply with their duty to serve prompt notice when they reserve their rights; to remove that potential penalty in

---

6. Because the assignment agreement expressly encompassed PVP's estoppel rights, we need not decide whether a typical assignment of "all rights, title and interest" or of "all claims and causes of action," which does not expressly refer to estoppel, would operate to transfer to the claimant the insured's right to assert estoppel against the insurer.

cases in which an insured is later compelled to assign its coverage rights to a third party may serve to promote the conduct that estoppel penalizes.

¶ 29 CNA argues that the superior court's ruling in this case violates the rule that a settlement by an insured "should not be used to obtain coverage that the insured did not purchase." *Morris,* 154 Ariz. at 120, 741 P.2d at 253. But the coverage that may obtain because an insurer is barred from litigating policy defenses in a case such as this does not arise out of the insured's settlement agreement with the claimant; rather, it results from the insurer's failure to timely reserve its rights to the detriment of the insured. *See id.* at 116, 741 P.2d at 249 (insurer "must defend its insured under a properly communicated reservation of rights or it will lose its right to later litigate coverage"). Simply put, an insurer that has failed to promptly reserve its rights does not escape the consequences of that failure simply because its insured assigns its coverage rights to another.

### 3. Pueblo proved sufficient prejudice for estoppel to attach.

¶ 30 Equitable estoppel applies if (1) the party to be estopped intentionally or negligently induces another to believe certain material facts, (2) the induced party takes actions in reliance on its reasonable belief of those facts and (3) the induced party is injured by so relying. *Joy Enters., Inc. v. Reppel,* 112 Ariz. 42, 45, 537 P.2d 591, 594 (1975).

¶ 31 CNA does not dispute that the first two elements of the doctrine were satisfied. It argues, however, that Pueblo did not show that PVP suffered an actual injury or harm as a result of CNA's delay in reserving its rights. *See Weiner v. Romley,* 94 Ariz. 40, 44, 381 P.2d 581, 583 (1963) (to support estoppel, alleged injury or prejudice "must be actual and substantial, and not merely technical or formal"). CNA calls the 18–month delay a "harmless mistake" and argues that Pueblo showed only that PVP lost

an opportunity to perform destructive testing of the alleged defects, the results of which might have strengthened PVP's defense. CNA argues that is a mere possibility of injury and insufficient to establish estoppel.

¶ 32 When viewed in a light most favorable to sustaining the superior court's decision, the record amply supports the superior court's conclusion that PVP was prejudiced by CNA's delay.

¶ 33 From the time PVP was brought into the litigation it was plain that the cost to repair or replace the damaged stucco was going to be substantial. Even though PVP shared the responsibility for the stucco work with another plastering subcontractor, it was obvious from the beginning that the lawsuit presented PVP with a significant risk of a large judgment.

¶ 34 CNA's position, however, was that the policy it issued to PVP would cover not a penny of the cost that would be required to repair or replace the stucco PVP had installed. CNA knew, but failed to inform PVP, that it would disclaim coverage for any of that damage and that it believed it was obligated only to cover the relatively minor ($20,000, plus or minus) cost of "resulting damage" such as damage to carpet and baseboards caused by water that infiltrated through cracks in the stucco. Thus, from the outset of the case, CNA understood that even if the jury were to find PVP's stucco work faulty and were to assess against PVP all damages the law allowed, CNA's liability under the policy would be limited to the fraction of the judgment representing water damage caused by cracks in the stucco. Under CNA's view of the policy, PVP alone would be responsible for the remainder of any judgment that might be assessed against it in the defect litigation.

¶ 35 These facts make plain that CNA's failure to promptly reserve its rights placed PVP in an untenable position, to say the least, as the litigation commenced. There was abundant evidence that the stucco that PVP installed on the townhomes had badly cracked.[7] In view of the many cracks in the

---

7. In a note to CNA, one of PVP's lawyers called the stucco work "lousy." According to an inter-

nal memo prepared by retained counsel, Keith

stucco and the Pueblo laboratory report critical of the stucco mix, PVP's best chance to avoid an adverse jury verdict arguably was to prove that its stucco had cracked not because of anything PVP had done but because of mistakes in how the buildings were designed or built that permitted the walls or foundations to shift, causing the stucco to crack as a result. The most powerful evidence of those factors was to be found beneath the stucco on the buildings, obtainable only through destructive testing. As the party facing the risk of an uninsured million-dollar judgment, PVP, much more than its insurer, would have been interested in pursuing destructive testing, either by having its own expert witnesses conduct such testing or, at the very least, by having them observe such testing conducted by other experts.

¶ 36 As noted, the court-ordered period within which to conduct destructive testing of the townhomes came more than a year after PVP was named in the litigation. Nevertheless, for whatever reason, PVP's lawyers did not consult with PVP about whether to participate in such testing; they did not even inform PVP that such testing was to take place. While the consequences of these decisions would have fallen on CNA if CNA were defending PVP without reservation, they fell instead on PVP, which was unable to protect itself from those consequences because it was unaware that CNA believed that the damages sought against PVP were for the most part not covered by the policy.

¶ 37 During the coverage trial, CNA relied on the testimony of the construction lawyer that it retained to represent PVP that even if PVP had known from the outset of CNA's reservation of rights, PVP likely would not have conducted destructive testing. The lawyer testified that not once in his career of representing subcontractors in construction defect cases has he advised a client to conduct destructive testing.[8] Because the plaintiff has the burden to prove the subcontractor's work is defective, he said destructive testing is too big a risk to take. CNA also argued that none of the expert witnesses called at trial testified that they would have performed destructive testing in October 2000, when the testing period occurred.

¶ 38 Evidence showed, however, that after PVP was informed of CNA's coverage defenses, Skeens, Keith and PVP's owners asked retained counsel to perform testing on the townhomes, only to be told that the court-imposed testing deadline had already passed. PVP believed additional testing would have shown the stucco was not defective and that the cracks were caused by building movement and design flaws. Because PVP did not have a representative perform or attend testing, however, the only tests it could rely on were those performed by Pueblo's experts, whose results PVP's witnesses described as flawed.

¶ 39 Keith, one of PVP's experts, testified that shortly after he came to the case he concluded the cracks in the stucco were caused by structural problems. He testified that if he had been retained earlier in the litigation he would have participated in overseeing Pueblo's destructive testing. Based on his 30 years of experience, he testified additional destructive testing would have shown that PVP was not responsible for the cracks in the stucco.

¶ 40 Although Keith testified that he rarely initiates destructive testing for a client in a case such as this, he said he does perform such testing if required to prove that a plaintiff's test is faulty.[9] He said he would have been prepared to testify at trial against Pueblo that the stucco cracks were caused in large part by failures by other subcontractors, but that his testimony would have been stronger if he had conducted or overseen destructive testing to make that point.

observed that the "overall workmanship" of the stucco on the townhomes was "poor."

8. The CNA claims handler, who specializes in construction defect cases, testified she never has had a lawyer for a subcontractor ask for destructive testing.

9. Lacking that opportunity in this case, Keith sought Pueblo's permission in July 2002 to x-ray the exterior of the buildings in an attempt to test a theory that the framing or other structural work was faulty. His efforts were stymied because Pueblo refused to permit such testing after the court-imposed testing period had expired.

¶ 41 Keith's testimony was reinforced by Pueblo's expert witness, lawyer Joseph Oliva, who testified that due to CNA's delay, PVP did not timely retain an expert and did not evaluate for itself whether to conduct destructive testing. Oliva emphasized that CNA's delay impaired PVP's efforts to refute liability in the underlying case by deflecting responsibility for the defects to other subcontractors.[10] In addition, he said testing would have aided PVP in refuting "coverage defenses that would otherwise be asserted by a prompt reservation of rights."[11]

¶ 42 The court also heard evidence that as trial in the underlying case approached, retained counsel sought to exclude Pueblo's expert report questioning the chemical composition of the PVP stucco because the original sample had been destroyed. PVP's retained counsel argued that the alleged "spoliation" of the stucco evidence had "resulted in irreparable prejudice to [PVP] based on its inability to defend against Pueblo's claims." This evidence undermined CNA's contention that PVP was not harmed by its inability to participate in the original destructive testing.

¶ 43 We conclude sufficient evidence supported the superior court's determination that PVP's lost opportunity to participate in destructive testing was sufficient prejudice to support a finding of estoppel. Given the pervasive nature of stucco cracks in the townhomes and Pueblo's report from the destructive testing concerning the chemical composition of the stucco, the court could have found that PVP faced almost certain liability unless it could show it was not responsible for the cracks. Trial testimony showed that had PVP known it was at substantial risk in the case, it could have retained an expert witness in time to participate in or conduct destructive testing. The expert it did retain—months after that testing had been completed—testified he would have participated in testing had he been retained before the testing deadline and that the testing likely would have helped PVP to prove it was not liable for the claimed damages.

¶ 44 In concluding that this evidence sufficiently supported the superior court's determination that CNA's conduct prejudiced PVP, we reject CNA's argument that the evidence showed only a "lost opportunity" that, as a matter of law, cannot support a finding of prejudice. CNA argues we should reject the superior court's findings because Pueblo failed to show that PVP sustained "material harm" or "actual harm" as a result of CNA's delay in reserving its rights. It cites no authority, however, for its assertion that prejudice for purposes of estoppel requires proof of objective, concrete injury.

¶ 45 Estoppel instead requires proof that one has "suffered a loss of a substantial character." *Knight v. Rice*, 83 Ariz. 379, 382, 321 P.2d 1037, 1039 (1958); *see Weiner*, 94 Ariz. at 44, 381 P.2d at 583 ("actual and substantial" injury). The court of appeals in Washington analyzed prejudice in a similar context in *R.A. Hanson Co. v. Aetna Casualty & Surety Co.*, 15 Wash.App. 608, 550 P.2d 701 (1976). The insurer in that case delayed two and a half months after receiving a notice of claim to inform the insured that it was reserving its rights. *Id.* at 703. The court remanded to the trial court for it to deter-

10. The superior court observed that had PVP been aware it faced substantial uninsured liability, PVP "could have conducted a vigorous cross claim action against" the framing subcontractor, which PVP's experts felt was at fault for the stucco cracks. On appeal, CNA argues that because liability in a case such as this is several and not joint, PVP would not have been permitted to file a cross-claim against another subcontractor. Whether or not that would have been the case, after the other subcontractors settled and assigned to Pueblo their indemnity rights against PVP, presumably PVP could have named the framing subcontractor as a non-party at fault. Thus, Pueblo's argument was not that PVP could have sought indemnification from other defendants; instead, it argued that evidence PVP could have obtained through destructive testing would have helped prove that others were at fault for the damages and/or that the damages were covered under the policy, thus absolving it of liability.

11. According to evidence at the estoppel trial, CNA insured the framing subcontractor that worked on the townhomes. Because PVP did not assign to Pueblo any bad-faith claim against CNA, and settled that claim separately, the superior court correctly did not rely on that evidence in deciding whether CNA's delay in reserving its rights prejudiced PVP.

mine whether the insured had proved the "factual existence of prejudice" from the delay. *Id.* at 704. By way of guidance for the trial court, the court described the nature of prejudice that would support application of estoppel in a case such as this:

> Prejudice may be shown through loss of a favorable settlement of the case, inability to produce all testimony existing in support of the defense, inability to produce any material witness, loss of the benefit of any defense in law or fact through reliance upon the insurer's [promise] to defend, or withdrawal by the insurer so near in time to trial that the insured is unable to prepare his defense.

*Id.* at 703.

¶ 46 The evidence in this case supported the superior court's conclusion that because of CNA's delay, PVP was prejudiced by its inability to produce evidence that would have supported a "defense in ... fact" to the claims against it. Under the circumstances presented here, there was sufficient evidence to support the superior court's conclusion that CNA's delay in reserving its rights to deny coverage inflicted such a loss on PVP.[12]

### C. Prejudgment Interest.

¶ 47 CNA argues the superior court erred in awarding prejudgment interest on the $1.1 million stipulated judgment because that amount was not liquidated until the court ruled after a hearing that the amount was reasonable. We agree. When parties stipulate to a judgment that is not final until a court determines the reasonableness of the settlement amount, interest does not begin to accrue on the stipulated amount until the date of the ruling.

■■■■ ¶ 48 Prejudgment interest accrues from the date damages are liquidated "as compensation for the detention of the money from the judgment creditor." *Ariz.*

*E. R.R. Co. v. Head,* 26 Ariz. 259, 262, 224 P. 1057, 1059 (1924). If damages are not liquidated, "no interest is allowed upon the theory that the person liable does not know the sum he owes and therefore can be in no default for not paying." *Id.* Damages are liquidated if "the evidence of damages furnishe[s] data which, if believed, makes it possible to compute the amount of damages with exactness, without relying upon opinion or discretion." *Banner Realty, Inc. v. Turek,* 113 Ariz. 62, 64–65, 546 P.2d 798, 800–01 (1976). Thus, prejudgment interest begins to accrue when the amount of damages can be computed with exactness, not when the amount of damages still must be determined by opinion or discretion.

■■■■ ¶ 49 When an insured and a claimant enter into a *Morris* agreement, "neither the fact nor amount of liability to the claimant is binding on the insurer *unless the insured or claimant can show that the settlement was reasonable and prudent.*" *Himes v. Safeway Ins. Co.,* 205 Ariz. 31, 36, ¶ 12, 66 P.3d 74, 79 (App.2003) (underlined emphasis added). In such a situation, the insured has the burden to prove that the agreed-upon amount is reasonable. *Id.* When "damages are subject to review for reasonableness, it is the absolute duty of the finder of fact to evaluate the evidence presented and determine what settlement amount the insured has proved reasonable by a preponderance of the evidence." *Id.* at 39, ¶ 24, 66 P.3d at 82. "[T]he primary purpose of a reasonableness hearing is to attempt to re-create the same result that would have occurred if there were an arm's-length negotiation on the merits of the case between interested parties." *Id.* at 38, ¶ 22, 66 P.3d at 81.

■■■■ ¶ 50 *Himes* makes clear that the amount of a judgment to be paid pursuant to a *Morris* agreement is not liquidated unless

---

12. Because we conclude the evidence was sufficient to prove prejudice to PVP, we decline to address Pueblo's contention that prejudice should be presumed whenever an insurer delays for a substantial period of time in notifying an insured that it is reserving its right to deny coverage. *Compare, e.g., Knox–Tenn Rental Co. v. Home Ins. Co.,* 2 F.3d 678, 685 (6th Cir.1993) (prejudice presumed when insurer fails to notify insured and controls defense through trial), *with Safeco Ins. Co. v. Ellinghouse,* 223 Mont. 239, 725 P.2d 217, 221 (1986) (prejudice is presumed when insurer delays in reserving rights), and *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Bruecks,* 179 Neb. 642, 139 N.W.2d 821, 829 (1966) (prejudice presumed in 17–month delay in reserving rights).

and until the court decides whether the amount of the proposed settlement is reasonable. It matters not that the parties have negotiated a sum certain; based on the evidence, the court must decide whether the proposed amount is reasonable, and, if not, it must decide what portion of the judgment is reasonable. *See Morris*, 154 Ariz. at 121, 741 P.2d at 254.

¶ 51 Because the settlement amount set out in a *Morris* agreement is not liquidated until the court determines the reasonableness of the judgment, prejudgment interest does not accrue until that time. Accordingly, interest on the $1.1 million judgment in this case accrues only from the date of the court's order approving the settlement. We therefore order the judgment modified accordingly.

### D. Attorney's Fees.

¶ 52 Finally, CNA contends, and Pueblo does not dispute, that if Pueblo is not entitled to prejudgment interest, the superior court's attorney's fee award violates A.R.S. § 12–341.01(B) (2003) to the extent the award exceeds the amount agreed to be paid by Pueblo.

¶ 53 Under section 12–341.01(B), the award of attorney's fees "may not exceed the amount paid or agreed to be paid." The court awarded Pueblo attorney's fees in the amount of $536,500. The retainer agreement between Pueblo and its counsel was for 38 percent of the gross recovery after deductions for fees owed to Pueblo's original counsel in the case. The maximum amount payable pursuant to that agreement is $469,831. We order the award modified to reflect this amount.

### CONCLUSION

¶ 54 We affirm the court's judgment estopping CNA from denying coverage under the policy issued to PVP, modify the award of prejudgment interest so that it runs only from the date of the reasonableness determination, and modify the attorney's fee award to $469,831.

CONCURRING: DANIEL A. BARKER, Presiding Judge and PATRICK IRVINE, Judge.

