**DESERT RIDGE RESORT LLC, Plaintiff,**

v.

**OCCIDENTAL FIRE & CASUALTY COMPANY OF NORTH CAROLINA, Defendant.**

**No. CV–14–01870–PHX–DLR**

United States District Court, D. Arizona.

Signed October 5, 2015

Filed October 7, 2015

Chris Robert Baniszewski, Warner Angle Hallam Jackson & Formanek PLC, Phoenix, AZ, Gary S. Thompson, Tara Alyssa Brennan, Reed Smith LLP, Washington, DC, Michael S. Dingman, Reed Smith LLP, Falls Church, VA, for Plaintiff.

Douglas L. Christian, Gena Lopresto Sluga, Lon Haley Johnson, Stephen M. Dichter, Christian Dichter & Sluga PC, Phoenix, AZ, for Defendant.

## ORDER

Douglas L. Rayes, United States District Judge

Before the Court are Plaintiff Desert Ridge Resort, LLC's ("DRR") motion for summary judgment, (Doc. 77), and Defendant Occidental Fire & Casualty Company of North Carolina's ("Occidental") motion for summary judgment, (Doc. 89). DRR has also filed a motion to exclude the expert report and testimony of James G. Woelfel, (Doc. 83), and a motion to strike Occidental's reply brief and reply statement of facts, (Doc. 102). Occidental has filed a motion to supplement its statement of facts, (Doc. 114). All the motions are fully briefed, and neither party has requested oral argument. For the reasons stated below, Occidental's motion for summary judgment is granted, DRR's motion for summary judgment is denied, DRR's motion to strike and motion in limine are denied, and Occidental's motion to supplement is denied.

## BACKGROUND

DRR owns the J.W. Marriott Phoenix Desert Ridge Resort & Spa in Phoenix, Arizona (the "Resort"). (Doc. 1–1, ¶ 2). In late 2000, DRR hired Hunt Construction Group, Inc. ("Hunt") to construct the $140 million Resort. (Id., ¶ 3.) Hunt subcontracted much of the work to other contractors, including West Coast Marble and Tile Contractor, LLC ("West Coast"), which tiled the bathrooms and installed the shower stalls, floors, curbs, and thresholds. (Id.) In order to limit its liability arising from its work, West Coast purchased two commercial general liability ("CGL") policies from Occidental with policy periods extending from February 11, 2003 to February 11, 2004 ("03–04 policy"), and February 11, 2004 to February 11, 2005("04–05 policy"). (Doc. 78, ¶ 3.)

In March 2010, DRR discovered significant water damage in the Resort's walls caused by construction defects in the shower stalls. (Id., ¶ 1.) Experts concluded that west coast improperly installed "end dams" on the shower floors and incorrectly constructed the walls of the shower stall. (Id.) As such, from the moment the showers were used, water began continuously leaking into the walls and floor, causing substantial structural damage. (Id.) DRR filed suit against west

coast and several other subcontractors in arizona state court alleging negligence, breach of implied warranty, and indemnity (the "underlying Action"). (Doc. 1–1, ¶ 6.) Zurich Insurance Company, a CGL Insurer, Defended All of the Subcontractors, Including West Coast, in the Underlying Action Under a Common "project Specific" Insurance Program. (Doc. 78, ¶ 11.) Three additional CGL Insurers also provided for West Coast's defense of DRR's Suit. (*Id.*)

On March 27, 2012, West Coast Filed a Claim Under each of the two cgl policies it purchased from occidental requesting a defense and indemnification in the underlying action. (*Id.*, ¶ 7.) Occidental received the claims the next day, and Julie Lindemann was assigned as the file handler. (Doc. 94, ¶ 8). On May 7, 2012, West Coast sent a letter to occidental stating that it had not received a response to its tender and requested that copies of the CGL policies be sent by May 21, 2012. (*Id.*, ¶ 10.)

Several months later, on november 27, 2012, occidental denied west coast's claims under both policies on two independent grounds: (1) the property damage "manifested subsequent to the expiration of the policy period" because it was not discovered until march 2010, and (2) the damage was caused by fungal growth, which is excluded from coverage by the policies. (Docs. 79–4 At 9, 79–5 At 9.)[1] Occidental cited several coverage provisions in the denial letters and stated, "we do not waive any of our rights or any of the other provisions or conditions of the policy[.]" (*Id.*) Shortly thereafter, West coast requested that occidental reevaluate the

claims and send copies of the policies. (Doc. 94, ¶¶ 19–20.)

On May 22, 2014, the underlying action was settled. As part of the settlement, DRR and West Coast entered into an agreement under *Damron v. Sledge,* 105 Ariz. 151, 460 P.2d 997 (1969), whereby the parties stipulated to entry of a $12 million judgment in favor of DRR; West Coast assigned all of its rights, claims, and causes of action against occidental to DRR; and DRR agreed not to take action or collect on the judgment against West Coast. (Doc. 78, ¶ 41.) DRR received a total of $8 million from the other defendants in the underlying action. (Doc. 96, ¶ 3.)

In July 2014, DRR, as assignee of West Coast's rights under the policies, filed the instant action against Occidental alleging claims for breach of contract, insurance bad faith, and a declaratory judgment that Occidental had a duty to defend and indemnify West Coast in the Underlying Action. (Doc. 1–1.) Both parties now move for summary judgment on all claims.[2]

## MOTIONS FOR SUMMARY JUDGMENT

### I. Legal Standard

Summary judgment is appropriate when, viewing the facts in a light most favorable to the nonmoving party, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment may also be entered "against a party who fails to make a show-

---

1. Citations to pages in the Court's docket are to the page numbers stamped at the top of the page by the Court's CM/ECF system, not the page numbers at the bottom of each page.

2. DRR argues Occidental's motion should be denied because it exceeds the 17–page limit,

uses less than 13 point font, uses footnotes instead of textual citations, and fails to include a separate motion. (Doc. 95 at 2–3.) After DRR raised this argument, Occidental complied with the Local Rules and modified its briefs accordingly. The Court will not deny a substantive motion on a technicality.

ing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323, 106 S.Ct. 2548. The burden then shifts to the non-movant to establish the existence of a material fact. *Id.* at 324, 106 S.Ct. 2548. The non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts," and instead must "come forward with 'specific facts showing that there is a genuine issue for trial.' " *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting Fed. R. Civ. P. 56(e) (1963)). A dispute about a fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). When presented with cross-motions for summary judgment, "the court must consider each party's evidence, regardless under which motion the evidence is offered." *Las Vegas Sands, LLC v. Nehme*, 632 F.3d 526, 532 (9th Cir.2011).

## II. Analysis

Occidental argues the policies do not cover the damage caused by West Coast's faulty construction of the showers. Specifically, it asserts (1) the damage is not covered because it occurred before the policies came into effect ("pre-existing damage" clause), (2) at least part of the damage is not covered because it includes the cost of removing and replacing West Coast's own work ("your work" exclusion),

and (3) certain damages are excluded because they were caused by mold (mold exclusion). DRR asserts Occidental is precluded from raising these grounds for denying coverage because they were not identified in Occidental's November 2012 denial letters. DRR also argues that none of these grounds bar recovery under the policies.

### A. Grounds for Denial in the *Damron* Context

The threshold issue in this case is whether Occidental may raise previously unidentified bases for denying coverage under the policies. Occidental initially denied West Coast's claims because: (1) the damage manifested after the policy periods expired, and (2) some of the damage was barred by the mold exclusion. (Doc. 79–4 at 9; Doc. 795 at 9.) Although Occidental quoted the "your work" exclusion, it did not specifically rely on it as a basis for denying the claims. Additionally, it is undisputed that Occidental did not rely on the "pre-existing damage" clause as a ground for denying the claims. (Doc. 78, ¶ 12; Doc. 94, ¶ 12.) DRR argues that, in the *Damron* context, an insurer may only litigate its previously identified bases for denying coverage, and thus Occidental cannot raise either of these new grounds as defenses to this action.

■ A *Damron* agreement is a "settlement agreement between an insured and an injured party in circumstances where the insurer has declined to defend a suit against the insured. In such an agreement, the insured agrees to liability for the underlying incident and assigns all rights against the insurance company to the injured party." *Quihuis v. State Farm Mut. Auto Ins. Co.*, 748 F.3d 911, 912 n. 1 (9th Cir.2014). *Damron* agreements do not "create coverage that the insured did not purchase.... To the contrary, [the insur-

er] is liable for the stipulated judgment only if the judgment constituted a liability falling within its policy." *Col. Cas. Ins. Co. v. Safety Control Co.*, 230 Ariz. 560, 567, 288 P.3d 764, 771 (Ct.App.2012) (internal quotations and citations omitted).

Similarly, where the insurer agrees to defend the insured but does so under a reservation of rights to later contest coverage, and the insured and injured party later enter into a stipulated judgment and assignment of rights, the agreement is called a *Morris* agreement. *See United Servs. Auto. Ass'n v. Morris*, 154 Ariz. 113, 119, 741 P.2d 246, 252 (1987). The insurer's reservation of rights must "fairly inform[ ] the insured of the insurer's position," *Equity Gen. Ins. Co. v. C & A Realty Co.*, 148 Ariz. 515, 518, 715 P.2d 768, 771 (Ct.App.1985), and "an insurer with a coverage defense must defend its insured under a properly communicated reservation of rights or it will lose its right to later litigate coverage," *Morris*, 154 Ariz. at 116, 741 P.2d at 249.

*Morris* agreements require the insurer to identify all of its bases for denying coverage. Grounds not identified in the reservation of rights may not be asserted later by the insurer as defenses to coverage. The policy behind this rule for *Morris* agreements stems from the competing interests of the insured and insurer that arise during the insurer's defense of the third-party action. When the insurer defends the insured under a reservation of rights, the insurer controls the defense of the insured, including the right to settle the case with the injured third-party. No conflict of interest exists in cases where the insurer has not indicated that it may deny coverage for the potential liability because the insured likely believes any liability it faces will be covered by the policy. But "when a claimant seeks damages the insurer may contend are not covered under the policy, the interests of the insured and insurer diverge." *Pueblo Santa Fe Townhomes Owner's Ass'n v. Transcontinental Ins. Co.*, 218 Ariz. 13, 19, 178 P.3d 485, 491 (Ct.App.2008). If the insured does not know the grounds on which the insurer may contest coverage, the insured is placed at a disadvantage because it loses the opportunity to investigate and prepare a defense on its own. Therefore, in the *Morris* context, where "[b]y virtue of its duty to defend, an insurer gains 'the advantage of exclusive control' over the litigation[,]" *id.* at 18, 178 P.3d at 490 (quoting *Morris*, 154 Ariz. at 117, 741 P.2d at 250), it would be unreasonable to permit the insurer to not disclose potential bases for denying coverage. If the insured is aware of the grounds on which it intends to deny coverage, the insured "may protect itself from the sharp thrust of personal liability by assigning to the claimant the insured's coverage rights under the policy." *Id.* at 19, 178 P.3d at 491 (internal quotation marks omitted). Without notice that the insurer is reserving its rights, the insured "has no reason to act to protect its rights because it is unaware that a conflict of interest exists between itself and the insurer." *Id.* The general rule precluding an insurer from raising new grounds contesting coverage in a subsequent action is justified in the *Morris* context.

Unlike *Morris* agreements, there is no prohibition on an insurer raising previously unidentified grounds for contesting coverage in the *Damron* context, and DRR points to no Arizona case establishing otherwise. As is the case here, because the insurer is not defending the insured, it does not gain exclusive control over the defense of the insured. The insurer has already indicated that it will not defend against the third-party action and denied coverage under the policy. The insured, armed with this knowledge, has the incentive to take the necessary steps to limit its

liability regardless of what grounds the insurer asserts for refusing to defend and denying coverage. Although knowledge of the specific grounds for denial assists the insured in assessing the merits of the insurer's coverage defenses, the insured is not placed at a great disadvantage without such knowledge because the insurer is not in a position to take advantage of the insured. The conflict of interest inherent in the *Morris* context is not present in the *Damron* context.

■ Here, Occidental refused to defend West Coast in the Underlying Action and denied coverage under the policies. Although it cited several portions of the policy and set forth two specific grounds for denial, it expressly stated that "[b]y naming the specific grounds for this disclaimer of coverage, we do not waive any of our rights or *any of the other provisions or conditions of the policy* [.]" (Doc. 82–12 at 50 (emphasis added).) The denial letters also stated that the decision to deny coverage was "based on all facts presently available to us[.]" (*Id.*) West Coast thus had knowledge that Occidental was denying coverage under the policies and reserving the right to raise other coverage defenses should additional facts arise in the future. As a result, West Coast took steps to limit its liability by entering into a *Damron* agreement with DRR. Accordingly, Occidental may raise its additional defenses to coverage in the instant suit.

DRR argues this result "would make entering *Damron* agreements nearly impossible.... An insurer could hide the ball or change the game." (Doc. 113 at 3.) But the rule applicable to *Morris* agreements is meant to protect the insured, not the injured party, and DRR does not argue West Coast would have acted differently had it known of Occidental's other coverage defenses. Nor does DRR assert that it would have not entered into the agreement had it known of the additional

coverage defenses. Both West Coast and DRR were aware Occidental was denying the claim and had reserved the right to raise other coverage defenses. Moreover, West Coast received a defense in the Underlying Action from another CGL carrier and ultimately protected itself from liability. Finding that Occidental could not assert legitimate coverage defenses would undermine the principle that *Damron* agreements are not meant to create coverage that the insured did not purchase.

The cases cited by DRR do not persuade the Court otherwise. *Kealy v. Carolina Cas. Ins. Co.*, No CV–05–0911–PHX–FJM, 2007 WL 158734, at *1 (D.Ariz. Jan. 16, 2007), did not arise in the *Damron* context. The insurer refused to defend the insureds and denied coverage based on a specific ground. *Id.* Thereafter, the insureds decided not to enter into a *Damron* agreement with the injured party. *Id.* at *3. When they brought suit directly against the insurer seeking coverage under the policy, the insurer raised a new ground for denying coverage. *Id.* The insureds argued that the insurer had waived or was estopped from asserting new bases to deny coverage because they relied on the originally-asserted bases when they decided to forgo the *Damron* agreement. *Id.* The court agreed because the insurer had knowledge of the facts necessary to raise additional grounds for denial and the insureds had relied on the previously-identified grounds for denying coverage to their detriment. *Id.*

*Kealy* does not stand for the general rule that insurers may not raise additional grounds for denying coverage in a *Damron* case. The court relied on principles of waiver and estoppel in finding the insurer could not raise a new ground for denying coverage after the insureds had forgone an opportunity to limit their liability. Here, however, West Coast protected its rights by entering into a *Damron* agreement

with DRR. There is no evidence of detrimental reliance on the part of West Coast, or that Occidental intended to waive its defenses.[3]

*Kealy* is also distinguishable because the insurer possessed the necessary information on which to assert additional grounds for denying the claim, but chose not to do so. *Id.* Here, Occidental did not have the necessary information to raise the new grounds for denying coverage. The March 27, 2012 letter requesting tender of defense and indemnity on behalf of West Coast provided no facts regarding when the damage began to occur. It stated: "We currently do not have any information regarding the date on which West Coast substantially completed its work under the four subcontracts." (Doc. 85–12 at 54.) Occidental knew only that the Resort had been substantially completed in March 2003 and that the damage was discovered in March 2010. (*Id.*) Without information as to when the damage began occurring and when West Coast had completed its work, Occidental had no reason to raise the "pre-existing damage" exclusion because there was no basis on which to conclude the damage occurred prior to the

policy period. Nor was there any information relating to whether damages were attributable to replacing or removing West Coast's own work. Unlike *Kealy*, Occidental did not possess the necessary facts on which it could raise additional grounds for denying coverage.[4]

DRR also points to *Quihuis v. State Farm Mut. Auto. Ins.*, 235 Ariz. 536, 547, 334 P.3d 719, 730 (2014), which states that a judgment obtained under a *Damron* agreement "will not preclude the insurer from litigating its identified basis for contesting coverage[.]" DRR emphasizes the word "identified" and claims the inverse is also true—that an insurer may not raise previously *unidentified* bases for contesting coverage in the *Damron* context. But *Quihuis* stands for no such proposition. It dealt with issue preclusion, specifically whether a default judgment obtained under a *Damron* agreement precluded the insurer from "litigating any coverage issues subsumed in that judgment." *Id.* at 546, 334 P.3d at 729. The court rejected the argument, noting that no actual litigation had taken place regarding the issue of coverage. *Id.*[5]

3. In its motion for summary judgment and its supplemental brief, DRR quotes the following sentence, which it asserts comes from *Kealy*: "[I]n a *Damron* case, an insurer cannot invoke any coverage defense in any manner that was not specifically set forth in its denial letter." (Docs. 77 at 9, 113 at 2.) But *Kealy* says no such thing. In fact, this language is not attributable to any case in any jurisdiction. The Court is concerned that DRR's counsel would reference a quote that does not exist, especially one pertaining to an issue integral to this case.

4. The earliest date on which Occidental possessed facts to reevaluate its coverage position appears to be on April 7, 2014, when Lindemann stated in her claims handling notes that she "[c]ompleted further research ... and it appears we should provide a defense under the first policy.... Unclear when damage first occurred; however, also appear [sic] AZ is not applying a manifestation trigger. Sub-

sequent policy contains pre-existing damage exclusion which would continue to preclude coverage." (Doc 94, ¶ 28.) She wrote that Occidental "will discuss joining defense with [West Coast's counsel]" and "[w]ill reassert coverage disclaimer under the 04–05 policy and defend under the 03–04 policy." (*Id.*) West Coast and DRR entered into the *Damron* agreement six weeks later.

5. DRR also cites *Jobe v. Int'l Ins. Co.*, 933 F.Supp. 844, 861 (D.Ariz.1995) for the proposition that "an insurer waives any defenses not revealed to the insured when the claim is originally denied." But DRR takes this statement out of context. *Jobe* stated: "although Arizona has not addressed the issue, other jurisdictions have found that an insurer waives any defenses not revealed to the insured when the claim is originally denied." *Id.* Moreover, the order was withdrawn, and thus has no precedential value. *See* 1 F.Supp.2d 1403.

DRR also argues Occidental waived its right to assert the "your work" and "pre-existing damage" exclusions and is estopped from raising them. "Waiver of a right requires a clear showing of an intent to waive that right." *Servs. Holding Co. v. Transamerica Occidental Life Ins. Co.*, 180 Ariz. 198, 206, 883 P.2d 435, 443 (Ct.App.1994). Intent may be inferred from conduct. *Id.* "On the other hand, a party asserting an estoppel claim must show that it, 'having the right to do so under all the circumstances of the case, has, in good faith, relied thereon' [to its detriment]." *Id.* at 207, 883 P.2d at 444 (quoting *Waugh v. Lennard*, 69 Ariz. 214, 223, 211 P.2d 806, 812 (1949)).

The denial letters expressly reserved the right to raise additional grounds for denial as more facts become available, which is inconsistent with an intent to waive the defenses. In addition, there is no evidence Occidental knew of the facts necessary for it to deny coverage based on the "your-work" or "pre-existing damage" provisions, and thus it could not have intended to waive these coverage defenses when it failed to assert them in the denial letters. Nor is there evidence that West Coast relied on the denial letters to its detriment in executing the *Damron* agreement.[6] Consequently, neither theory precludes Occidental from raising these coverage defenses.[7]

Because a *Damron* agreement cannot "create coverage that the insured did not purchase," *Col. Cas. Ins. Co.*, 230 Ariz. at 567, 288 P.3d at 771 (internal quotation marks omitted), and because there is no

rule in Arizona prohibiting insurers from raising additional grounds for denying coverage in this context, the Court will consider Occidental's additional grounds for denying coverage under the policies.

### B. Coverage Under the Policies

"The interpretation of an insurance policy is a legal question for the court to resolve." *Messina v. Midway Chevrolet Co.*, 221 Ariz. 11, 14, 209 P.3d 147, 150 (Ct.App.2008). Policy language is interpreted according to its plain and ordinary meaning, and when "policy language is unambiguous, the court does not create ambiguity to find coverage." *Am. Family Mut. Ins. Co. v. White*, 204 Ariz. 500, 503, 65 P.3d 449, 452 (Ct.App.2003). "Generally, the insured bears the burden to establish coverage under an insuring clause, and the insurer bears the burden to establish the applicability of any exclusion." *Keggi v. Northbrook Prop. & Cas. Co.*, 199 Ariz. 43, 46, 13 P.3d 785, 788 (Ct.App.2000). Although Occidental cites three provisions under which it claims the damage caused by West Coast to the Resort is not covered or excluded, the Court finds the pre-existing damage clause dispositive.

### 1. Pre–Existing Damage

The policies issued by Occidental contain a "Pre–Existing Injury or Damage Endorsement for Artisans/Sub–Contractors." (Doc. 90–9 at 40; Doc. 90–10 at 52.) It provides: "This insurance applies to 'bodily injury' and 'property damage' only if (1) the 'bodily injury' or 'property damage' is caused by an 'occurrence' that takes place

---

**6.** DRR asserts that entering into a *Damron* agreement in and of itself constitutes detrimental reliance. (Doc. 113 at 8.) But DRR cites no Arizona case law, and DRR offers no argument as to how West Coast was harmed as a result of entering into the *Damron* agreement in the Underlying Action that limited its own liability.

**7.** DRR's reliance on Ariz. Admin. Code § R20–6–801(G)(1)(a) is also unpersuasive. This section applies to initial notices of denial or acceptance of a claim made under an insurance policy. It says nothing about whether an insurer may raise a new ground for denying coverage in the *Damron* context.

in the 'coverage territory', and (2) [t]he 'bodily injury' or 'property damage' first occurs during the policy period." (*Id.*) This language modifies Coverage A, which in its original form, only required that the bodily injury or property damage "occur[ ] during the policy period." (Doc. 90 at 19.) Occidental argues the damage is not covered because the endorsement modifies the policies' insuring clause, and the damage first occurred at the end of 2002, before the policy came into effect on February 11, 2003.

 DRR claims that Occidental has the burden to prove the damage began occurring before the policy periods because it is relying on this exclusion, but instead cites additional language from the same endorsement, which contains "Exclusion (o)," "Exclusion for 'Bodily Injury' or 'Property Damage' Which First Occurs Prior to Inception of Policy." (*Id.*) Exclusion (o) provides:

> This insurance does not apply to any "bodily injury" or "property damage" which was in progress as of the inception date of this policy or which first occurred, or which is alleged to have first occurred, prior to the inception date of this policy, whether such "bodily injury" or "property damage" is known or unknown by any insured.

> This exclusion applies regardless of whether any "bodily injury" or "property damage" which first occurred prior to the inception date of this policy or which is, or alleged to be occurring as of the inception of this policy, continues or pro-

gressively deteriorates during the policy period.

(*Id.*) DRR claims this language is an exclusion, which places the burden on Occidental to prove the damage began occurring before the policy periods. However, Occidental—not DRR—chooses the ground on which to deny coverage. The provision upon which Occidental relies is a modification of the insuring clause in Coverage A, not an exclusion. As such the burden remains on DRR to establish coverage under the 03–04 policy. DRR has not met its burden. Its argument that the damage did not begin occurring until March 2003, when the Resort "substantially opened," and is therefore covered, (Doc. 95 at 12), is not supported by the undisputed facts.[8]

Occidental provides evidence demonstrating the Resort opened in late 2002 and began serving a large number of guests. An internal memo dated May 18, 2000 from Marriott indicates the Resort was scheduled for a "soft-opening" on November 4, 2002, and a "grand opening" on December 12, 2002. (Doc. 90–4 at 23.) Occidental also submitted deposition testimony taken during the Underlying Action from Robert Hart, the general manager of the Resort, who testified that the Resort opened to the public on November 30, 2012. (Doc. 90–5 at 111.) Moreover, Marriott International, Inc.'s 2002 Annual Report states, "In 2002, we opened our 2,500th hotel, the 950–room JW Marriott Desert Ridge Resort & Spa in Phoenix. In its first full month of operation, Desert Ridge ran at 80 percent occupancy." (Doc. 90–2 at 11.)[9]

---

8. The parties do not dispute that the damage began when the showers were first put to substantial use. (Doc. 90, ¶ 14; Doc. 96, ¶ 14.) Occidental argues this occurred in December 2002, and DRR argues this occurred in March 2003. As such, the point in time at which the damage occurred was either prior to the 03–04 policy taking effect or immediately thereafter. From these facts, it is clear the damage does not fall within the 04–05

policy given the pre-existing damage clause. Therefore, Occidental is granted summary judgment on the issue of coverage to the extent DRR seeks to recover under the 04–05 policy.

9. DRR generally asserts other evidence submitted by Occidental regarding the opening date of the Resort is also inadmissible. (Doc. 95 at 12.) But DRR does not specifically

▮ DRR argues the Annual Report is hearsay, (Doc. 98 at 7).[10] "A trial court can only consider admissible evidence in ruling on a motion for summary judgment." *See Orr v. Bank of Am. NT & SA*, 285 F.3d 764, 773 (9th Cir.2002). But if the "evidence could conceivably be converted into an admissible form for trial, the Court [may] consider the evidence for the purposes of summary judgment." *Cheeks v. Gen. Dynamics*, 22 F.Supp.2d 1015, 1027 (D.Ariz.2014). Here, the contents could be admitted at trial under Rule 803(6) as a business record. Occidental could call a witness with knowledge of Marriott's books to testify that these reports are made in the regular course of business and prepared by people with personal knowledge. *See United States v. Bonallo*, 858 F.2d 1427, 1435 (9th Cir.1988) (noting business record exception applies where record is based on information transmitted by a person with knowledge at or near the time of the transaction, made in the ordinary course of business, and trustworthy). DRR does not challenge the contents of the Annual Report, and thus all of the requirements of Rule 803(6) would be met. *See* Fed. R. Ev. 803(6)(A)–(E). The Court will consider the evidence. *See SEC v. Jasper*, 678 F.3d 1116, 1121 (9th Cir.2012) (finding trial court properly admitted 10–K filing of nonparty corporation under Rule 803(6) where witness authenticated the document). Regardless, the unchallenged sworn deposition testimony of Robert Hart alone, absent admissible testimony to the contrary, establishes the undisputed fact of the 2002 opening.

Based on its expert's report, DRR argues the Resort did not open until March 2003. The expert's report references an unidentified State Court Report that showed that "water leakage commenced in March 2003, shortly after substantial completion and guest use of the Hotel showers[.]" (Doc. 78–3 at 3.) However, the expert's conclusion that the Resort opened in March 2003 is not based on personal knowledge or supported by any factual basis, except a conclusion from some other unidentified report. DRR has presented no other evidence regarding this issue, either in the form of affidavits, deposition testimony, or internal documents.

Consequently, the Court finds that the admissible undisputed evidence is that the Resort opened to the public in late 2002, not March 2003. Upon opening, the showers underwent substantial use and began causing damage to the Resort. Even viewing the facts in a light most favorable to DRR, the Court finds no reasonable jury could conclude the damage began in March 2003. DRR has failed to come forth with evidence creating a genuine dispute of fact on this issue.

### 2. Other Policy Provisions.

Because the pre-existing damage clause bars coverage in this case, the Court will not address Occidental's alternate arguments regarding the "your work" exclusion and the mold exclusion. The damage caused by West Coast is not covered under the 03–04 policy, and summary judgment will be granted in favor of Occidental.

### C. Bad Faith Claims.

▮ In count three of its complaint, DRR argues Occidental breached the covenant of good faith and fair dealing by refusing to defend and indemnify West Coast under the policies. "[A]n insurance

---

challenge the May 18, 2000 memo or the deposition testimony of Hart, and these evidentiary objections are deemed waived.

10. DRR did not raise this objection until its reply brief, and Occidental did not have an opportunity to respond. Regardless, no additional briefing is necessary because the evidence would be admissible at trial.

carrier acts at its peril when it declines to represent an insured, for in the absence of fraud or collusion, it will be bound by the judgment if there is coverage under the policy." *State Farm Mut. Auto Ins. Co. v. Paynter,* 122 Ariz. 198, 204, 593 P.2d 948, 954 (1979). "[A] bad faith claim based solely on a carrier's denial of coverage will fail on the merits if a final determination of noncoverage is ultimately made." *Manterola v. Farmers Ins. Exchange,* 200 Ariz. 572, 579, 30 P.3d 639, 646 (Ct.App.2001); *see also Frog, Switch & Mfg. Co., Inc. v. The Travelers Ins. Co.,* 193 F.3d 742, 751 n. 9 (3d Cir.1999) ("[T]he court's determination that there was no potential coverage means that the insurer had good cause to refuse to defend.").

DRR's claim of bad faith based on Occidental's failure to defend and indemnify West Coast fails because the damage is not covered by the 03–04 policy.

DRR also claims that Occidental acted in bad faith by "unreasonably processing West Coast's claim." (Doc. 77 at 15.) Specifically, DRR alleges that Occidental (1) failed to respond to West Coast's initial tender and second request for eight months; (2) failed to respond to or reevaluate West Coast's three requests for reconsideration for sixteen more months; (3) failed to reassign the claim to a responsive file handler despite these delays and thirteen separate reminders to act; (4) failed to withdraw or revise its initial coverage denial after realizing its bases were wrong; and (5) failed to provide West Coast with a copy of its policies despite at least four requests over two years.

(*Id.* at 15–16 (citations omitted).) Assuming Occidental committed bad faith for its allegedly improper handling of West Coast's claim, DRR has presented no evidence that West Coast suffered resulting damages, either in the form of additional attorneys' fees, expenses, or loss of the opportunity to settle the claim. As such, DRR's bad faith claim premised on Occidental's alleged mishandling of the claim is meritless. Summary judgment is granted in favor of Occidental on these claims.[11]

### *MOTION TO STRIKE*

Occidental filed its motion for summary judgment on June 15, 2015. DRR timely responded on July 17, 2015. Occidental filed its reply brief on August 6, 2015. DRR now moves to strike Occidental's reply and reply statement of facts as untimely, asserting they should have been filed on August 3, 2015. (Doc. 102.)

Under LRCiv. 7.2 and 56.1(d), the moving party has "fifteen (15) days after service of the responsive memorandum within which to serve and file a reply memorandum." Service may be executed by electronic means, Fed. R. Civ. P. 5(b)(2)(E), which affords the responding party with an additional three days to file their response, Fed. R. Civ. P. 6(d). Here, Occidental received a "Notice of Electronic Filing" of DRR's responsive memorandum on July 17, 2015. (Doc. 106–1 at 2.) The fifteenth day to respond fell on Saturday, August 1, 2015, and thus, pursuant to Rule 6(a)(1)(c), the deadline was automatically extended to Monday, August 3, 2015. However, under Rule 6(d), the deadline was further extended to Thursday, August 6, 2015, because DRR served its response electronically. Occidental complied with this deadline by filing its reply on August 6, 2015.

DRR contends that Occidental's reply was untimely because DRR also completed

---

11. DRR repeatedly argues Occidental's alleged failure to provide copies of the policies to West Coast. But DRR fails to argue that West Coast would have acted differently had it received the policies. DRR also fails to establish prejudice as a result of not having copies of the policies.

service by hand delivery on July 17, 2015. Rule 6(d) does not provide additional days for acting in response to documents served by hand delivery. *See* Fed. R. Civ. P. 6(d). DRR argues that its service by hand delivery superseded its electronic service and, therefore, Occidental's reply was due by August 3, 2015.

But LRCiv. 5.5(c) requires that attorneys use electronic filing, "[u]nless otherwise ordered by the Court or provided by the Administrative Manual." DRR does not suggest that it was excused from the mandated use of electronic filing. Accordingly, DRR's argument is meritless, and its motion to strike will be denied.

### *MOTION IN LIMINE*

DRR has filed a motion to exclude the testimony of Occidental's expert, James G. Woelfel. (Doc. 83.) The Court did not rely on any testimony from Woelfel in its summary judgment analysis. Moreover, the Court need not address whether Woelfel's testimony and report is admissible at trial because the issue of coverage is dispositive. The motion is denied as moot.

### *MOTION TO SUPPLEMENT*

Occidental has filed a motion to supplement its separate statement of facts filed in conjunction with its motion for summary judgment. (Doc. 114.) It seeks to add one additional fact and includes a copy of a management agreement between Marriott International, Inc. and DRR, which states that the Resort opened on November 30, 2002. (Doc. 114–3 at 168.) DRR argues this evidence should have been raised earlier and, if the Court considers it, requests that it be allowed to supplement its separate statement of facts. (Doc. 118.) But the Court did not consider this evidence in its decision, so the motion is denied as moot.

**IT IS ORDERED:**

1. Occidental's motion for summary judgment, (Doc. 89), is **GRANTED**.
2. DRR's motion for summary judgment, (Doc. 77), is **DENIED**.
3. DRR's motion in limine, (Doc. 83), is **DENIED**.
4. DRR's motion to strike, (Doc. 102), is **DENIED**.
5. Occidental's motion to supplement, (Doc. 114), is **DENIED**.
6. The Clerk is directed to **terminate** this action.

