634 P.2d 972

Helga CHARBONNEAU, Plaintiff-Appellant,

v.

BLUE CROSS OF WASHINGTON AND ALASKA, Defendant-Appellee.

Helga CHARBONNEAU, Plaintiff-Appellee,

v.

BLUE CROSS OF WASHINGTON AND ALASKA, Defendant-Appellant.

Nos. 1 CA–CIV 4911, 1 CA–CIV 4923.

Court of Appeals of Arizona, Division 1, Department A.

Aug. 4, 1981.

Rehearing Denied Sept. 30, 1981.

Review Denied Oct. 20, 1981.

O'Connor, Cavanagh, Anderson, West-over, Killingsworth & Beshears by Larry L. Smith, Calvin L. Raup, Phoenix, for plaintiff-appellant and plaintiff-appellee.

Carson, Messinger, Elliott, Laughlin & Ragan by Larry G. Haddy, Evan R. Laughlin, Harry M. Beggs, Richard J. Woods, Phoenix, for defendant-appellee and defendant-appellant.

## OPINION

CONTRERAS, Presiding Judge.

Helga Charbonneau (Charbonneau) commenced this action to recover benefits assertedly payable by Blue Cross of Wash-ington and Alaska (Blue Cross) under a group medical insurance policy issued to her employer, S.S.T. Travel Schools. The trial court granted Blue Cross's motion for summary judgment, thus determining that it had no liability. The trial court then denied Blue Cross's request for attorneys' fees. Both parties brought timely appeals which were consolidated by order of this court. We affirm both the judgment and the order denying attorneys' fees.

## INTERPRETATION OF INSURANCE POLICY

Charbonneau first became employed by S.S.T. Travel Schools (S.S.T.) on August 1, 1976. She remained employed by S.S.T. through July 31, 1977, when she resigned to take other employment. There is no indication that her resignation was anything but total and unconditional. Some seven weeks later, on September 19, 1977, she again became employed by S.S.T. She remained employed by S.S.T. from that time through the disposition of the litigation in the trial court.

On November 1, 1976, during Charbonneau's first term of employment, S.S.T. obtained a policy of group medical insurance issued by Blue Cross. It is not disputed that Charbonneau was covered under this policy from the time of its inception through July 31, 1977, when she resigned from her employment. There is likewise no dispute that Charbonneau was covered under the policy from and after November 1, 1977. The present controversy stems from the fact that Charbonneau was discovered to be suffering from a brain tumor on January 5, 1978, necessitating her hospitalization for surgery on February 27, 1978. She remained in the hospital through May 18, 1978, and incurred surgical and medical expenses in excess of $18,000 during this period. Coverage for these expenses was refused by Blue Cross pursuant to provisions in Part VII of the insurance agreement, entitled "Exclusions, Exceptions and Limitations." These provisions provide in pertinent part:

A. The Blue Cross Plan shall not be required to furnish any items of Hospital Care, surgical or medical benefits, other than those set forth above, nor to furnish such Hospital Care, surgical or medical benefits for:

. . . .

17. The following conditions, *until after six (6) consecutive months from the effective date of coverage* under this Agreement, or in the event the Member is hospitalized at the end of said six (6) month period, such conditions will be covered after the date of discharge from the hospital.

. . . .

b. Hernia, cardiac, vascular, renal, *cancerous or tumorous conditions.*

c. Any condition, disease or ailment which manifested itself before the Member's effective date.

(emphasis added).

It is Blue Cross's position that Charbonneau's coverage was unambiguously terminated when she resigned her employment on July 31, 1977.[1] Therefore, it contends Charbonneau had the status of a new employee when she was rehired in September, 1977, and the six-month period referred to in the preceding provisions must be computed from November 1, 1977, pursuant to other provisions of the policy.[2]

Charbonneau contends that it was her intention and the intention of her employer to reinstate her previously existing coverage upon her re-employment, and that this could be accomplished under the terms of the policy. Alternatively, she argues that if the terms of the policy are not to such effect, they are at least ambiguous and must be construed to provide coverage for the insured. Specifically, Charbonneau argues that: (1) Part VIII of the policy entitled as it is "Conversion Privilege" does not give effective notice of a termination of coverage, and (2) from one provision of the policy which refers to reinstatement it was possible for her and S.S.T. to reinstate her earlier coverage and that the failure of the policy to spell out the mechanics of such a reinstatement and restoration of her original coverage results in ambiguity which imposes liability on the insurer.

Charbonneau cites a number of general principles of which we are mindful. Where there is doubt or ambiguity regarding insurance coverage or its terms, an insurance contract will be construed liberally in favor of the insured. *Ranger Insurance Co. v. Lamppa,* 115 Ariz. 124, 563 P.2d 923 (App. 1977). In determining whether there is ambiguity, the language must be viewed from the standpoint of the average layman untrained in either law or insurance. *Federal Insurance Co. v. P. A. T. Homes, Inc.,* 113 Ariz. 136, 547 P.2d 1050 (1976); *Droz v. Paul Revere Life Insurance Co.,* 1 Ariz.App. 581, 405 P.2d 833 (1965). At the same time, of course, an insurance policy is a contract subject to the cardinal interpretative rule that the intention of the parties as expressed in the instrument is controlling, *D.M.A.F.B. Federal Credit Union v. Em-*

---

1. This position is based on a portion of the policy covering conversion privileges which provides:

If the Subscriber ceases to be employed or connected with the Group through which he or she has been covered under this Agreement, or if a Family Member ceases to be eligible according to the criteria outlined in Part I. E. coverage shall terminate automatically without notice at the end of the period for which Subscription Charges have been paid. If, however, Subscription Charges have been paid through the Group for at least one (1) month, and the Subscriber or Family Member, as the case may be, wishes to maintain continuous coverage, application must be made to the Blue Cross Plan within thirty (30) days of the date on which coverage terminates.

2. The policy of group insurance issued by Blue Cross to S.S.T. provides that the employer's application is a part of the contract. The policy further provides that eligible employees must submit a completed application card through the employer following an initial 30-day probationary period. In the case of an employer like S.S.T. who paid 100 percent of subscription costs, a new employee is covered on the monthly billing date following completion of the probationary period. Since Charbonneau was rehired on September 19, 1977, Blue Cross contends that Charbonneau became insured anew for the second time on November 1, 1977.

*ployers Mutual Liability Insurance Co.*, 96 Ariz. 399, 396 P.2d 20 (1964), and the policy must be read as a whole, so as to give a reasonable and harmonious effect to all of its provisions. *Droz v. Paul Revere Life Insurance Co., supra.*

■ Bearing these principles in mind, we must reject Charbonneau's first contention that the policy in question here fails to give effective notice that coverage completely terminates if the individual ceases to be employed. The main thrust of Charbonneau's argument in this regard is that the provisions of Part VIII are mislabeled, since the title of the section is "Conversion Privilege." Appellant relies for her contention in this regard upon *Transamerica Insurance Co. v. McKee*, 27 Ariz.App. 158, 551 P.2d 1324 (1976), where Division Two of this court held that the term "family protection" was not adequately descriptive of uninsured motorist coverage. We do not think an analogous situation exists in this case. Here, we are dealing with group medical insurance obtained by appellant as an individual insured through her employer, by virtue of her employment. Under these circumstances, we do not find the title "Conversion Privilege" (referring to the subscriber's privilege to apply for an individual policy independent of the employment relationship) to be materially misdescriptive of provisions in regard to termination. Part VIII clearly advises a member that coverage ceases with cessation of employment, and we see no reason to deny it effect.[3]

■ As a subsidiary contention, Charbonneau argues that the policy is unclear as to the precise time that coverage is terminated because coverage is stated to terminate "at the end of the period for which Subscription Charges have been paid." Other provisions of the policy provide for monthly payment of subscription charges by the employer. Again, we find no material ambiguity, or lack of clarity.

■ We must also reject Charbonneau's second argument that the policy failed to state how she might be "reinstated," thus, according to Charbonneau, depriving her and her employer of the opportunity to make her coverage continuous from November 1, 1976—the date the employer first obtained group medical insurance.[4] In regard to this argument, Charbonneau refers to Part IV, paragraph C, of the policy which provides:

C. Upon failure to pay the Subscription Charges on behalf of any Member, the rights of the Member under this Agreement shall be terminated, except as provided in Part X of this Agreement, until said Member shall have been reinstated pursuant to the provisions of eligibility as defined herein.

The short answer to this contention is that Charbonneau became ineligible for coverage when she resigned at the end of July, 1977. She remained ineligible for coverage until she was rehired in September. The reinstatement referred to in Part IV, paragraph C of the policy, quoted above, has no application in the situation where a member ceases employment. It refers to a situation where subscription payments are not made on behalf of an employee member. We cannot read it as giving rise to any material ambiguity under the factual situation pres-

---

3. In addition to the termination provisions in Part VII, Part XI, Paragraph O reads as follows:

VESTED RIGHTS—Except as specifically provided in Part VI.K.4 and Part X, this Agreement confers no rights which continue beyond the date of termination, and consequently, no rights conferred by this Agreement shall, in any way, be deemed vested. No Member subject to such termination shall be entitled to any benefits or payments conferred by this Agreement for any services, treatment, medical attention or care rendered after the date of termination.

4. Charbonneau contends S.S.T. made an attempted reinstatement by including in its October 1, 1977, remittance to Blue Cross a payment for coverage for Charbonneau. S.S.T. received the following response from appellee:

No application card for Helga. (If a rehire, still need new application.) If this is the Charbonneau deleted from 8–1 billing and is not a re-hire, premium must be paid for the lapse in her coverage in August & September.

Refund enclosed for October.

**164**

ently before us. The provisions of the policy as a whole preclude the construction which appellant would give it.

Blue Cross's position in this litigation is bottomed on the premise that a rehired employee is in all material respects the same as a new employee. We find nothing in the policy which undercuts the validity of that premise. It follows that the six-month period prerequisite to coverage for cancerous and tumorous conditions applied to Charbonneau following her re-employment in September, 1977. Charbonneau's effective date of coverage was November 1, 1977, and since the tumorous condition for which Charbonneau obtained medical treatment occurred within six months from November 1, 1977, the trial court correctly concluded that Blue Cross was without liability for the resulting medical expenses.

### ATTORNEYS' FEES

Blue Cross has appealed from the trial court's order denying its attorneys' fees. It asserts that attorneys' fees in this litigation arising out of contract were denied for the sole reason that appellant stated she could not afford to pay them. This, Blue Cross contends, is of itself an insufficient reason for denying attorneys' fees.

Charbonneau points out that she gave testimony at a hearing on Blue Cross's motion for attorneys' fees and that the transcript of testimony has not been made available to the court. This alone provides a basis for denying relief on appeal. *Orlando v. Northcutt*, 103 Ariz. 298, 441 P.2d 58 (1968). However, extending beyond this as a basis for denial, it is established that an award of attorneys' fees pursuant to A.R.S. § 12–341.01 is permissive, not mandatory. *Title Insurance Co. v. Acumen Trading Co.*, 121 Ariz. 525, 591 P.2d 1302 (1979); *Circle K Corp. v. Rosenthal*, 118 Ariz. 63, 574 P.2d 856 (App.1978). The statute's provisions are broadly discretionary except for the provisions of subsection C, which we find inapplicable here. Therefore, we will not disturb the trial court's exercise of discretion and accordingly affirm the ruling denying attorneys' fees.

The judgment and order of the trial court from which the appeals have been taken are in all respects affirmed.

OGG and DONOFRIO, JJ., concur.