Honorable James A. Soto, United States District Judge
Pending before the Court are motions for summary judgment filed by Wilshire Insurance Company ("Wilshire"), Girard *934 Insurance Services, Ira Girard and Mary Ann Girard (collectively referred to as "Girard"), and Patrick Yager and Javier Lopez (collectively referred to as "Yager"[1] ). Upon review of the parties' motions, responses, replies, statements of fact, opposing statements of fact and supplemental facts, evidence submitted in support of the filings,[2] and pertinent authority, Wilshire's motion for summary judgment is granted, and Yager's and Girard's motions for summary judgment are denied.[3]
STANDARD OF REVIEW
Summary judgment is appropriate where "there is no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). A genuine issue exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," and material facts are those "that might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc. , 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).[4] A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim." Id. An issue of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." Id. Thus, the "mere scintilla of evidence" in support of the nonmoving party's claim is insufficient to defeat summary judgment. Id. at 252, 106 S.Ct. 2505. However, in evaluating a motion for summary judgment, "the evidence of the nonmoving party is to be believed, and all justifiable inferences are to be drawn in his favor." Id. at 255, 106 S.Ct. 2505.
BACKGROUND
This case involves an insurance dispute that arises from an automobile accident in Tucson, Arizona. On November 12, 2014, Javier Lopez was driving his 2004 Econoline Van ("Van"). The Van was involved in an accident with a motorcycle driven by Patrick Yager. Yager suffered various physical injuries in the accident. It is disputed as to who was at fault in the accident. Yager argues that Lopez made an unsafe lane change and collided with Yager. Wilshire argues that Yager had been in three other accidents, had been required to go to driving school twice for speeding, that he has driven his motorcycles at speeds of 190 miles an hour, that Yager lacks any memory of the accident, and that the three eye witnesses to the accident indicated that Yager caused the accident.
After the accident, Yager filed a lawsuit in Pima County Superior Court against Lopez alleging that he was at fault in the accident; in addition, Alonso Pastor was also named in the lawsuit ("State Lawsuit"). Pastor was named in the State Lawsuit as he was the named insured under a commercial auto liability policy with Wilshire; the Van that Lopez owned was added as a covered auto under Pastor's previously existing policy with Wilshire, but Lopez was not listed as a named insured under that policy (the "Policy").[5] There is *935 no evidence reflecting that Wilshire was aware of Lopez's existence prior to the accident in question; Wilshire was only informed of Lopez's existence after the accident had already occurred.[6]
Lopez tendered his defense to Wilshire pursuant to the Policy issued to Pastor. In March of 2015, Wilshire retained counsel to defend Lopez in the State Lawsuit. However, by August of 2015, Wilshire sent Lopez a reservation of rights letter informing him that while Wilshire would continue to provide counsel to Lopez in the State Lawsuit, it was doing so under a reservation of rights because although Lopez's Van was listed as a covered auto under Pastor's Policy, Lopez was not an insured under the Policy (i.e., one has to be both an "insured" driving a "covered auto" for liability coverage to apply).
Yager's claims in the State Lawsuit against Pastor were dismissed at summary judgment, and that dismissal was affirmed on appeal. The State Lawsuit against Lopez ended when Lopez entered into a Morris agreement with Yager whereby Lopez assigned all of his rights against Wilshire and Girard to Yager; pursuant to the Morris agreement, the parties stipulated to a judgment of $1.5 million, and Yager agreed not to seek recovery of the judgment, or any other form of damages, against Lopez. Thereafter, Wilshire filed the instant declaratory judgment action against Yager and Lopez in this Court seeking a declaration that Wilshire owed no duty to indemnify. Thereafter, Yager asserted claims for breach of contract and bad faith against Wilshire, and claims against Girard stemming from its failure to properly procure insurance coverage for Lopez.
DISCUSSION
The Insurance Policy and Reasonable Expectations
Wilshire and Yager have both moved for summary judgment as to the issue of whether Lopez was covered by the Policy. The Court agrees with Wilshire's position that the Policy is unambiguous and does not cover Lopez.
Contract interpretation is a matter of law, and whether the terms of the contract are ambiguous is also a matter of law. United States v. King Features Entm't, Inc. , 843 F.2d 394, 398 (9th Cir. 1988) ; Liristis v. Am. Family Mut. Ins. Co. , 204 Ariz. 140, 61 P.3d 22, 26 (App. 2002) ; Keggi v. Northbrook Prop. & Cas. Ins. Co. , 199 Ariz. 43, 13 P.3d 785, 788 (App. 2000). Insurance policies "must be read as a whole, so as to give a reasonable and harmonious effect to all of its provisions." Nat'l Fire Ins. Co. of Hartford v. James River Ins. , 162 F.Supp.3d 898, 903-04 (D. Ariz. 2016), clarified on denial of reconsideration , No. 14-CV-00765-PHX-JAT, 2016 WL 2606984 (D. Ariz. May 6, 2016) (quoting Charbonneau v. Blue Cross , 130 Ariz. 160, 634 P.2d 972, 975 (App. 1981) ). If the language is still "reasonably susceptible to differing interpretations" then it is ambiguous. Premier Physicians Grp., PLLC v. Navarro , 240 Ariz. 193, 377 P.3d 988, 990 (2016). The policy should be interpreted from the viewpoint of "the average layman, who is untrained in the law or the field of insurance." Nat'l Fire Ins. Co. of Hartford , 162 F.Supp.3d at 904 (quoting Liristis , 61 P.3d at 25-26 ). When the policy language is clear, it shall be afforded its "plain and ordinary meaning"
*936 and applied as written. Nat'l Fire Ins. Co. of Hartford , 162 F.Supp.3d at 904 (quoting Liberty Ins. Underwriters, Inc. v. Weitz Co. , 215 Ariz. 80, 158 P.3d 209, 212 (App. 2007) ; Sparks v. Republic Nat. Life Ins. Co. , 132 Ariz. 529, 647 P.2d 1127, 1132 (1982) ; see Holder v. Mercury Cas. Co. , 2010 WL 431234, at *2. Courts should use common sense and not create ambiguity where none exists. Employers Mut. Cas. Co. v. DGG & CAR, Inc. , 218 Ariz. 262, 183 P.3d 513, 515 (2008) (en banc) (quoting State Farm Mut. Auto. Ins. Co. v. Wilson , 162 Ariz. 251, 782 P.2d 727, 733 (1989) ). As the insuring clause (as opposed to an exclusion) is at issue, Yager has the burden of proving that Lopez was an insured under the Policy. See Keggi v. Northbrook Property and Cas. Ins. Co. , 199 Ariz. 43, 46, 13 P.3d 785, 788 (Ct. App. 2000) ("Generally, the insured bears the burden to establish coverage under an insuring clause, and the insurer bears the burden to establish the applicability of any exclusion."); see also Salerno v. Atlantic Mutual Ins. Co. , 198 Ariz. 54, 58, 6 P.3d 758, 762 (App. 2000) ("Only if an insured's claims fall within the coverage provisions will we address the meaning and effect of policy exclusions.").
As pertinent to the dispute at bar, the Policy states in relevant part:
SECTION II - LIABILITY COVERAGE
We will pay all sums an 'insured' legally must pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies, caused by an 'accident' and resulting from the ownership, maintenance or use of a covered 'auto.' ...
1. Who Is An Insured
The following are 'insureds':
a. You for any covered 'auto.'
b. Anyone else while using with your permission a covered 'auto' you own, hire or borrow except:
(1) The owner or anyone else from whom you hire or borrow a covered 'auto'. This exception does not apply if the covered 'auto' is a trailer connected to a covered 'auto' you own.
(2) Your 'employee' if the covered 'auto' is owned by that 'employee' or a member of his or her household.
(3) Someone using a covered 'auto' while he or she is working in a business of selling, servicing, repairing, parking or storing 'autos' unless that business is yours.
(4) Anyone other than your 'employees', partners (if you are a partnership), members (if you are a limited liability company), or a lessee or borrower or any of their 'employees', while moving property to or from a covered 'auto.'
(5) A partner (if you are a partnership) or a member (if you are a limited liability company) for a covered 'auto' owned by him or her or a member of his or her household.
c. Anyone liable for the conduct of an 'insured' described above but only to the extent of that liability.
See Doc. 178-1[7] at p. 37.[8]
Yager primarily argues that Lopez was covered by the Policy because *937 Lopez's Van (which was involved in the accident in this case) was specifically listed as a covered auto under the Policy. While the Van was indeed listed as a covered auto under the Policy, it does not change the fact that the Policy clearly states that liability coverage only applies if you are also an insured under the Policy (i.e., liability coverage only applies if one is an insured who is driving a covered auto). There are three categories of insureds under the Policy. Under section "a", the Policy states that "You" refers to the named insured listed in the Declaration. Lopez is not listed as a named insured; only Pastor is listed as a named insured. Under section "b", one is considered an insured if the named insured (i.e., Pastor) gives permission to drive a "covered 'auto' you own, hire or borrow." Lopez owned the Van involved in the accident; as such, Pastor did not give Lopez permission to drive a Van that Lopez actually owned. As to section "c", Lopez was driving the subject vehicle (not Pastor) at the time of the accident; thus, Lopez could not be liable for Pastor's conduct under the circumstances at bar. Although Lopez was driving a covered auto under the Policy, Lopez was not an insured under the Policy such that liability coverage did not attach. See Ogden v. U.S. Fid. & Guar. Co. , 188 Ariz. 132, 136-37, 933 P.2d 1200 (Ct. App. 1996) (although the driver of the vehicle involved in the accident was driving a vehicle that was listed as a covered vehicle under the insurance policy, liability coverage did not apply because the driver was not an insured entitled to any liability coverage as reflected in the exclusions in the insurance policy); Isaak v. Massachusetts Indem. Life Ins. Co. , 127 Ariz. 581, 584-85, 623 P.2d 11 (1981) (holding that a driver was not entitled to liability coverage because, while the vehicle he drove was a covered vehicle under the insurance contract, he was not an authorized driver under the insurance contract or a party to the contract).[9] Summary judgment is granted in favor of Wilshire as to the issue of liability coverage under the Policy.
Wilshire also argues that the reasonable expectations doctrine does not apply under the circumstances of this case, and therefore it is entitled to summary judgment as to this issue. The Court agrees.
Insurance provisions that are facially valid may be invalidated if they subvert the insured's reasonable expectations. See Gordinier v. Aetna Cas. & Sur. Co. , 154 Ariz. 266, 742 P.2d 277, 283 (1987). "Arizona courts will not enforce even unambiguous boilerplate terms in standardized insurance contracts in a limited variety of situations: 1. Where the contract terms, although not ambiguous to the court, cannot be understood by the reasonably intelligent consumer who might check on his or her rights, the court will interpret them in light of the objective, reasonable expectations of the average insured ... 2. Where the insured did not receive full and adequate notice of the term in question, and the provision is either unusual *938 or unexpected, or one that emasculates apparent coverage ... 3. Where some activity which can be reasonably attributed to the insurer would create an objective impression of coverage in the mind of a reasonable insured ... 4. Where some activity reasonably attributable to the insurer has induced a particular insured reasonably to believe that he has coverage, although such coverage is expressly and unambiguously denied by the policy ..." Id. at 283-84 (emphasis in the original).
"[M]ost insureds develop a reasonable expectation that every loss will be covered by their policy, ... the reasonable expectation concept must be limited by something more than the fervent hope usually engendered by a loss." Lincoln Tech. Inst. of Arizona, Inc. v. Fed. Ins. Co. , 927 F.Supp. 376, 379 (D. Ariz. 1994), aff'd , 76 F.3d 387 (9th Cir. 1996) (quoting Millar v. State Farm Fire & Cas. Co., 167 Ariz. 93, 804 P.2d 822, 826 (App. 1990) ). The expectation must be objectively reasonable. Id.
As a threshold matter, as discussed above, Lopez was not a named insured under the Policy. Pastor was the named insured under the Policy and had the contract of insurance with Wilshire. Lopez was not a party to the insurance contract with Wilshire, and therefore Lopez's reasonable expectations have little impact on the enforceability of the Policy in this case. See Ogden , 188 Ariz. at 138-139, 933 P.2d 1200. Furthermore, to the extent Pastor's reasonable expectations are also considered in conjunction with Lopez's reasonable expectations, application of the reasonable expectations doctrine is unwarranted under the circumstances of this case. The clear terms of the Policy were obvious; a reasonably intelligent consumer who checked on his rights would understand the terms at issue, and the terms at issue are not unusual or unexpected, and do not emasculate apparent coverage. As discussed above, the Policy states that liability coverage only applies to insureds, Lopez was not listed as a named insured, and Lopez did not meet the basic definition of who was considered an insured under the contract. It's not unusual or unexpected for an insurance company to limit coverage to specific insured individuals. In addition, the record does not show that any additional explanation was warranted as to the unambiguous insuring terms at bar. Wilshire never even knew of the existence of Lopez until after the accident occurred in this case. Wilshire did not take any action to induce any objective belief that Lopez was covered under the Policy. Summary judgment is granted in favor of Wilshire as to the doctrine of reasonable expectations. See Ogden , 188 Ariz. at 134, 138-139, 933 P.2d 1200 (in the course of addressing a policy similar to the Wilshire Policy, the court held that the doctrine of reasonable expectations was inapplicable as the expectations of a non-party to the insurance contract have little effect upon the enforceability of the contract, and as pertinent to the insured [who was a party to the contract], the exclusionary provision in the policy was obvious in the document and could be understood by a reasonably intelligent consumer, the provision was not unusual or unexpected, and there was no indication that the insured gave the insurer any reason to believe further explanation was warranted).
Waiver and Estoppel
Wilshire and Yager have both moved for summary judgment as to the issues of waiver and estoppel. The Court agrees with Wilshire's position as to these issues; Wilshire is entitled to summary judgment.
As a general matter, "waiver, either express or implied, has been defined as the voluntary and intentional relinquishment *939 or abandonment of a known right. It is unilateral in that it arises out of either action or non-action on the part of the insurer or its duly authorized agents and rests upon circumstances indicating or inferring that the relinquishment of the right was voluntarily intended by the insurer with full knowledge of all of the facts pertaining thereto ... Estoppel ... refers to a preclusion from asserting a right by an insurer where it would be inequitable to permit the assertion. It arises by operation of law, and rests upon acts, statements or conduct on the part of the insurer or its agents which lead or induce the insured, in justifiable reliance thereupon, to act or forbear to act to his prejudice. Abatement of the right or privilege involved by way of estoppel need not be intentionally, voluntarily or purposely effected by or on the part of the insurer." McCollum v. Continental Cas. Co., 151 Ariz. 492, 495, 728 P.2d 1242, 1245 (Ct.App.1986).
The Arizona cases most relevant to the specific circumstances in this case (i.e., alleged harm stemming from an insurance company's delayed reservation of rights) are Penn-Am. Ins. Co. v. Sanchez , 220 Ariz. 7, 202 P.3d 472 (Ct. App. 2008) (" Penn-Am ") and Pueblo Santa Fe Townhomes Owners' Ass'n v. Transcon. Ins. Co. , 218 Ariz. 13, 178 P.3d 485 (Ct. App. 2008) (" Pueblo "). The plaintiffs in Penn-Am argued that both waiver and estoppel barred the insurance company from denying coverage based on the ground that the insurance policy did not cover the losses at issue. See Penn-Am , 220 Ariz. at 11, 202 P.3d 472 (the plaintiffs argue that "Penn-America has waived or is estopped from asserting any coverage defenses because its reservation of rights was untimely"). In such circumstances, the Penn-Am court emphasized that "unreasonable delay [in reserving rights] without prejudice to the insured will not cause loss of the insurer's coverage defenses. Prejudice to the insured is required." Id. at 13, 202 P.3d 472.
Penn-Am involved an auto accident that occurred while a delivery was being made on behalf of a warehouse company ("Inside Arizona") responsible for transporting commercial goods; the auto accident occurred on June 30, 2000 and resulted in the death of three people. See Penn-Am at 218 Ariz. at 8, 202 P.3d 472. The statutory beneficiaries of the deceased sued Inside Arizona for wrongful death. Id. On approximately December 18, 2001, Inside Arizona notified its insurance agent ("Bowman") of the lawsuit, and Bowman in turn notified Inside Arizona's commercial general liability ("CGL") insurer ("Penn-Am") of the lawsuit. Id. at 9, 202 P.3d 472.
The Penn-Am policy provided for coverage in the amount of $1,000,000 per occurrence, but the policy contained "an exclusion for any coverage for '[b]odily injury' or 'property damage' arising out of the 'ownership, maintenance, use or entrustment to others' of an automobile." Id. In December of 2001, Penn-Am's claims adjuster ("Wastle") contacted Bowman to determine whether the accident might be covered under a wholly separate policy of insurance such as a business automobile policy; Wastle was informed by Bowman that Inside Arizona also had a separate business automobile policy that was issued through National American Insurance Company of California ("National"). Id. The National policy also provided $1,000,000 of liability coverage per occurrence. Id. at 15, 202 P.3d 472. Nonetheless, Wastle determined that "there was 'sufficient information or allegations to trigger [Penn-America's] duty to defend,' and Wastle retained counsel to defend Inside Arizona in the lawsuit. Id. National did not receive any notice of the lawsuit from Wastle, or any other representatives of Penn-Am, in December of 2001. Id. at 9-10, 202 P.3d 472 Rather, National did not receive notice of the lawsuit until October 15, 2002; at that time, Penn-Am tendered the *940 defense of Inside Arizona to National. Id. at 10, 202 P.3d 472. On October 16, 2002, Penn-Am issued a reservation of rights letter to Inside Arizona explaining that the Penn-Am policy did not cover the accident in question, but continued to provide a defense under a reservation of rights. Id.
By the time Penn-Am had reserved its rights and notified National of the lawsuit in mid-October of 2002, the discovery deadline in the wrongful death lawsuit had already expired on September 30, 2002, and cross-motions for summary judgment were already pending in the trial court. Id. at 10, 13, 202 P.3d 472. In light of these circumstances, National took the position that it was prejudiced by the very late notice it received of the lawsuit, and would not commit to providing liability coverage to Inside Arizona. Id. at 13-15, 202 P.3d 472. Inside Arizona never notified its other insurer (i.e., National, whose policy with Inside Arizona separately provided $1,000,000 in coverage) of the lawsuit at an earlier period in time as it relied on Penn-Am representing it from December of 2001 until October 16, 2002 (i.e., when Penn-Am first issued a reservation of rights to Inside Arizona). In the midst of this time frame, on October 1, 2002, the statutory beneficiaries of the deceased offered to settle the entire wrongful death lawsuit for $925,000. Id. at 9, 202 P.3d 472. This settlement offer was extended several times with a final deadline to accept the offer by January 16, 2003, or the offer would expire and the statutory beneficiaries would enter into a Morris agreement with Inside Arizona. The final settlement offer was never accepted, and the statutory beneficiaries entered into a Morris agreement with Inside Arizona on January 17, 2003 whereby Inside Arizona assigned its rights against Penn-Am to the statutory beneficiaries. Id. at 10, 202 P.3d 472.[10]
Because of Penn-Am's unreasonable delay in reserving its rights, Inside Arizona's business auto insurer (National) was not notified of the wrongful death lawsuit until discovery had already closed and cross-motions for summary judgment were pending. Id. at 9-10, 13-15, 202 P.3d 472. As such, National refused to commit to providing coverage (which included $1,000,000 per occurrence), and the offer to settle the entire case against Inside Arizona for $925,000 relating to the wrongful death of three people expired. Id. Under these circumstances, the court found that the insured (Inside Arizona) was prejudiced by the insurer's (Penn-Am) unreasonable delay in reserving its rights. Id. at 13-15, 202 P.3d 472.
Pueblo involved a lawsuit by a homeowners' association (Pueblo Santa Fe Townhomes Owners' Association - "Pueblo") against several general contractors and subcontractors that were involved in constructing homes in the Pueblo community. Pueblo , 218 Ariz. at 16, 178 P.3d 485. Among the named defendants accused of defective construction work was subcontractor Palo Verde Plastering ("Palo Verde"); Palo Verde performed stucco work on 34 of the homes in the Pueblo community, and Pueblo's damages included repair or replacement costs of $2.3 million for the cracked stucco. Id.
In August of 1999, Palo Verde notified its insurance company ("Transcontinental") that it was named as a defendant in the Pueblo lawsuit, and Transcontinental retained a law firm to represent Palo Verde in the suit. Id.
*941 Palo Verde's insurance policy contained a "your work" exclusion whereby there was no liability coverage for repairing or replacing Palo Verde's work (i.e., stucco damages over a million dollars); rather, relevant coverage only applied to incidental damage caused by Palo Verde's work (such as water seepage into homes through cracks in the stucco). Id. In light of this exclusion, Transcontinental estimated that liability coverage under Palo Verde's policy would be no more than $20,000, and Palo Verde faced uninsured exposure between $600,000 to $1.5 million. Id. at 17, 178 P.3d 485.
Although Transcontinental retained defense counsel to defend Palo Verde in the Pueblo lawsuit in August of 1999, Transcontinental did not issue a reservation of rights letter to Palo Verde until February of 2001. Id. at 16, 178 P.3d 485. By the time Palo Verde received the reservation of rights in February of 2001, the most important deadline relating to Palo Verde's defense had already expired in October of 2000; the superior court had set a deadline for destructive testing in October of 2000, and ordered that any expert that failed to conduct destructive testing by the deadline would not be permitted to conduct any additional testing past the deadline. Id. at 16, 21-23, 178 P.3d 485. "Destructive testing often is performed in construction-defect cases to determine the extent of damage and evidence of the existence or cause(s) of particular defects. Where stucco cracks are abundant, for example, parties may hire consultants to cut through the stucco and the wall beneath to determine whether water has permeated the interior of the building through the cracks. Destructive testing also may disclose the cause of the defects-where stucco has cracked, for example, destructive testing may reveal foundation movement or unstable framing or other structural problems that may have caused the cracks." Id. at 16, 178 P.3d 485.
Counsel retained by Transcontinental never took any action to engage in destructive testing prior to October of 2000, and did not even obtain an expert for Palo Verde until seven months after the deadline expired. Id. at 17, 178 P.3d 485. When Palo Verde received the reservation of rights in February of 2001, it retained separate counsel to monitor the lawsuit and assigned an employee with a background in chemistry to evaluate the claims against Palo Verde; the employee was critical of the calculations and logic underlying Pueblo's expert report criticizing the chemical content of the stucco. Id. There was evidence that the stucco cracks at issue in the Pueblo litigation were not caused by Palo Verde's work, but were caused by the work of other subcontractors relating to foundation movement and other design flaws; however, Pueblo was deprived of the opportunity to substantiate this position as the deadline to participate in destructive testing had already expired. Id. at 22-23, 178 P.3d 485. Around the same time, as the October of 2001 trial date was approaching, other defendant contractors began reaching settlements with Pueblo that preserved their indemnity rights against Palo Verde. Id. at 17, 178 P.3d 485. On the eve of trial, Palo Verde entered into a Morris agreement with Pueblo. Id. at 17-18, 178 P.3d 485.
The Pueblo court observed that "[i]n view of the many cracks in the stucco and the Pueblo laboratory report critical of the stucco mix, [Palo Verde's] best chance to avoid an adverse jury verdict ... was to prove that its stucco had cracked not because of anything [Palo Verde] had done but because of mistakes in how the buildings were designed or built that permitted the walls or foundations to shift, causing the stucco to crack as a result. The most powerful evidence of those factors was to be found beneath the stucco on the buildings, obtainable only through destructive *942 testing." Id. at 22, 178 P.3d 485. The evidence showed that had Palo Verde been informed of the reservation of rights and the destructive testing deadline prior to the expiration of the deadline in October of 2000, it could have and would have retained its own expert to participate in or conduct destructive testing, and that the testing would likely prove that Palo Verde was not liable for the claimed damages. Id. at 22-23, 178 P.3d 485. Under these circumstances, the Pueblo court found prejudice arising from the insurer's delay in reserving its rights. Id. at 23, 178 P.3d 485 (prejudice requires "proof that one has suffered a loss of a substantial character").
Unlike the insureds in Penn-Am and Pueblo , there is no evidence that Lopez suffered any prejudice as a result of Wilshire's delay in issuing a reservation of rights letter to Lopez. Wilshire retained counsel to defend Lopez in the State Lawsuit in March of 2015. By August of 2015, Wilshire had issued its reservation of rights letter to Lopez. There is no evidence that the defense provided to Lopez (via counsel retained by Wilshire on Lopez's behalf) was in any way improper. There is no evidence that had the reservation of rights been issued earlier, counsel for Lopez would have done anything differently, or that Lopez could have and would have done anything differently, to avoid any purported prejudice stemming from the delay in the reservation of rights. Yager argues, for example, that he was prejudiced because he testified at a deposition and responded to discovery, that a policy limit settlement offer of $750,000 expired prior to the issuance of the reservation of rights, and that Wilshire's refusal to indemnify him exposed him to the risk of losing his license to operate his van to transport customers. However, there is no evidence that Lopez was prejudiced by participating in discovery or being deposed, or that he lost his license due to the delay in the reservation of rights. Likewise, unlike the insured in Penn-Am who could have satisfied the $925,000 settlement demand via a second insurance policy with a separate insurer, there is no evidence that Lopez could have satisfied the $725,000 settlement demand made in this case. The evidence before the Court does not support waiver or estoppel in this case. There is no evidence supporting detrimental reliance and prejudice stemming from Wilshire's delay in sending the reservation of rights letter to Lopez.[11] Summary judgment is granted in favor of Wilshire as to waiver and estoppel.
As the Court has found that Lopez was not entitled to any liability coverage under the Policy, and that all of Plaintiff's alternative grounds for liability coverage are without basis, Wilshire's motion for summary judgment is granted, and Plaintiff's motion for summary judgment or in the alternative for partial summary adjudication is denied.
Girard's Motion for Summary Judgment
Girard's motion for summary judgment only warrants a brief discussion as it is primarily premised on accepting Girard's position that there is no evidence showing that Girard was aware of Lopez's existence prior to the accident. Girard argues, for example, that as of the time period prior to the accident: Girard employees have stated that they never had any contact with Lopez and were not aware of Lopez; there are no receipts showing that Lopez made any payments at Girard's office regarding Pastor's Policy; there are no phone records showing any contact between Girard and *943 Lopez; and there is no physical documentation to substantiate any claim that Girard was aware of Lopez. Therefore, according to Girard, as it was completely unaware of Lopez's existence prior to the accident, it cannot be held liable for Yager's claims of negligence, breach of good faith and fair dealing, reasonable expectations of coverage, and punitive damages stemming from any failure to properly procure insurance for Lopez.
There is evidence, however, reflecting that Girard was aware of Lopez prior to the accident. For example, according to Lopez's deposition testimony, during the time period prior to the accident: Lopez personally met with and spoke to Girard employee Francine Dortch seven times in Girard's office; Lopez only dealt with Dortch at Girard; Lopez made in-person payments on the Policy at Girard's office; Dortch was told that Lopez owned the Van; Lopez was told that he was covered under the Policy; when Lopez noticed that his name did not appear on some documents related to the insurance, and he pointed this concern out to Dortch, Dortch told Lopez that it was fine and there was no problem.
In light of the foregoing, there are material issues of fact precluding summary judgment in favor of Girard; Girard's motion for summary judgment is denied.[12]
MOTIONS IN LIMINE
As the Court has granted summary judgment in favor of Wilshire, Wilshire's motions in limine[13] (Docs. 141, 146, 147, 148, 169) are denied as moot.[14]
As to Girard's "motion to strike expert opinion of Daniel Fink" (Doc. 145)[15] and "joint Daubert motion RE: expert Carmine Cornelio's opinion of reasonableness of Morris agreement" (Doc. 156), both motions are denied. Although one motion is titled a "motion to strike" and the other is titled a "Daubert" motion, both motions are motions in limine (although titled under different names) seeking to exclude evidence at trial. See Black's Law Dictionary (10th ed. 2014) (defining a "motion in limine" as a "[a] pretrial request that certain inadmissible evidence not be referred to or offered at trial"). As to Doc. 145, there was no conferral in compliance with LRCiv. 7.2(l), or this Court's Scheduling Order, prior to filing the motion. See LRCiv. 7.2(l) ("No opposed motion in limine will be considered or decided unless moving counsel certifies therein that the movant has in good faith conferred or attempted to confer with the opposing party or counsel in an effort to resolve disputed evidentiary issues that are the subject of *944 the motion. The moving party is not permitted to file a reply in support of its motion in limine."); Doc. 19 (Scheduling Order at p. 4) ("Motions in limine are discouraged if the parties can informally resolve the issues without Court intervention. Therefore, the parties must confer prior to the filing of a motion in limine to determine whether it can be avoided. Motions in limine must be accompanied by a notice of certification of conferral indicating that the parties have conferred to determine whether a motion in limine can be resolved through agreement, and have been unable to agree on a resolution of the motion. Motions in limine that do not contain the required certification may be stricken by the Court."). As to Doc. 145 and Doc. 156, both motions far exceed the page limits set by this Court in its Scheduling Order. See Doc. 19 (Scheduling Order at p. 4) ("Motions in limine (which includes Daubert /Rule 702 motions) shall be filed no later than fourteen (14) days after the filing of the proposed Joint Pretrial Order. Responses to motions in limine are due fourteen (14) days after the filing of the motions in limine. Unless otherwise ordered by the Court, no replies are permitted and motions in limine and responses thereto shall not exceed five (5) pages."). In light of the foregoing, Girard's motions in limine (Docs. 145, 156) are denied.
CONCLUSION
Accordingly, IT IS HEREBY ORDERED as follows:
(1) Girard's motion for summary judgment (Doc. 186), Yager's motion for summary judgment or in the alternative for partial summary adjudication (Doc. 180), and the motions in limine (Docs. 141, 145, 146, 147, 148, 156, 169) are denied.[16]
(2) Wilshire's motion for summary judgment (Doc. 177) is granted; the Clerk of the Court shall enter judgment in favor of Wilshire Insurance Company.
(3) Yager and Girard shall file their Proposed Joint Pretrial Order within 30 days of the filing date of this Order. See Doc. 19 (Scheduling Order at p. 4).[17]

Yager is the real party in interest in this case inasmuch as Lopez assigned all of his rights against Wilshire and Girard to Yager.

In addition to considering the parties' respective personal characterizations of the evidence as reflected in their briefs, statements of fact, oppositions thereto and supplemental facts, the Court has likewise considered the underlying evidence specifically cited by the parties in relation to all of those filings.

Because the briefing is adequate and oral argument will not help in resolving this matter, oral argument is denied. See Mahon v. Credit Bureau of Placer County, Inc. , 171 F.3d 1197, 1200-1201 (9th Cir. 1999).

Unless otherwise noted by the Court, internal quotes and citations have been omitted when quoting and citing cases throughout this Order.

Pastor had a commercial shuttle business; although Lopez did not work for Pastor in any capacity, and Lopez owned the Van that Lopez himself used to shuttle passengers, Pastor added Lopez's Van to his preexisting Policy.

The evidence reflects that Pastor and Lopez exclusively communicated with only Girard in relation to the Policy. To the extent that Girard later communicated with Statewide Insurance Company ("Statewide" - an agent of Wilshire) to procure Wilshire insurance coverage, there also is no evidence that Statewide was aware of Lopez's existence prior to the accident. There is no evidence that Girard is Wilshire's agent, and there is no evidence that Girard informed Wilshire or Statewide of Lopez's existence prior to the accident. Yager's separate claims against Girard are discussed later in this Order.

The policy also states: "throughout this policy the words 'you' and 'your' refer to the Named Insured shown in the Declarations. The words 'we', 'us', and 'our' refer to the Company providing this insurance." The only named insured listed in the policy is Alonso Pastor.

When citing to docket entries, page references are to the CM/ECF computer generated page numbers appearing in the upper right hand corner of the page.

To the extent that Yager generally argues that public policy somehow establishes liability coverage, Yager's position is not supported by the pertinent authority applicable to the circumstances of this case. For example, Yager argues that Arizona law generally requires insurance coverage where an insured grants a third party permission to drive the insured's vehicle. While this is true, it is irrelevant in this case. Lopez was driving the vehicle he owned which was involved in the accident with Yager. Pastor (the insured) did not give Lopez permission to drive the vehicle that Lopez actually owned. See Ogden , 188 Ariz. at 137-38, 933 P.2d at 1205-06 (holding that the driver of a vehicle was not a permissive driver under Arizona law entitled to liability coverage; rather, the driver was driving a vehicle that he owned, and the insured could not give the driver permission to drive the vehicle actually owned by the driver).

Prejudice to the insured is evaluated prior to the date of the Morris agreement. Id. at 15, 202 P.3d 472.

Moreover, the record does not reflect that Wilshire intended to waive its right to deny coverage, engaged in any action or inaction that would support waiver, and never communicated any waiver to Lopez or Pastor.

In reliance on a separately filed motion in limine to exclude the testimony of expert Carmine Cornelio (Doc. 156), Girard summarily argues that Yager cannot prove any damages to support any of his claims, and therefore summary judgment must be granted in its favor. However, as discussed herein, the motion in limine in question has been denied, and therefore there is no basis for Girard's position.

Although some of these documents were titled "motions to strike", they are motions in limine seeking to exclude evidence at trial.

To the extent that Girard filed joinders summarily relying on Wilshire's motions in limine appearing at Docs. 146, 147, and 148, those motions have now been denied. If the issues in those denied motions are still pertinent to the remaining case against Girard, Girard may file its own motions in limine arguing why such evidence is inadmissible at trial as it relates to the claims remaining against Girard.

Although Doc. 145 is titled as a joinder in Wilshire's motion, it is a substantive motion in limine that discusses pertinent facts and authority applicable to the claims against Girard, and it stands on its own apart from Wilshire's motion.

As Girard's motion for summary judgment has been denied, Yager's motion to strike (Doc. 209) (pertaining to Girard's summary judgment motion) is denied as moot.

Any party may file a motion seeking to stay the remaining deadlines in the case pending a settlement conference. In addition, the Court notes that it can set up a settlement conference with a Magistrate Judge at no cost to the parties.